**ORIGINAL**

1 | Joseph R. Saveri (State Bar No. 130064)
*jsaveri@lchb.com*
2 | LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
3 | San Francisco, CA 94111-3339
Telephone: (415) 956-1000
4 | Facsimile: (415) 956-1008

5 | Daniel Berger
*dberger@bm.net*
6 | Eric L. Cramer
*ecramer@bm.net*
7 | David F. Sorensen
*dsorensen@bm.net*
8 | John D. Radice
*jradice@bm.net*
9 | BERGER & MONTAGUE, P.C.
1622 Locust Street
10 | Philadelphia, PA 19103
Tel: (215) 875-3000
11 | Fax: (215) 875-4604

12 | Joshua P. Davis (State Bar No. 193254)
*davisj@usfca.edu*
13 | LAW OFFICES OF JOSHUA P. DAVIS
437A Valley Street
14 | San Francisco, CA 94131
(415) 422-6223
15 |

16 | *Attorneys for Plaintiff Rochester Drug Co-Operative, Inc.*
17 |

NOV 2 7 2007

NORTHERN DISTRICT OF CALIFORNIA

18 |                    UNITED STATES DISTRICT COURT

19 |                 NORTHERN DISTRICT OF CALIFORNIA

20 |                    SAN FRANCISCO DIVISION

21 |

22 | ROCHESTER DRUG CO-OPERATIVE,     Case No.
INC., on behalf of itself and all others
23 | similarly situated,                **CLASS ACTION COMPLAINT**

24 |              Plaintiff,             **JURY TRIAL DEMAND**

25 | v.

26 | ABBOTT LABORATORIES,

27 |              Defendant.

28 |

## NATURE OF THE ACTION

Plaintiff Rochester Drug Cooperative, Inc. brings this class action on behalf of itself and all others similarly situated challenging defendant Abbott Laboratories' unlawful monopolization of the market for boosted protease inhibitors, a class of drugs used to treat medical disorders caused by the human immunodeficiency virus ("HIV"). Defendant Abbott Laboratories ("Abbott" or "Defendant") has unlawfully leveraged its monopoly position as the sole provider of Norvir, a protease inhibitor ("PI") that is used to boost the therapeutic effects of other protease inhibitors, in order to disadvantage its competitors and restrict competition in the closely related boosted PI market. This unlawful scheme has resulted in a suppression of competition in the boosted PI market and has caused Plaintiff and other purchasers to pay supracompetitive prices for the relevant drugs.

## PARTIES

1.    Plaintiff Rochester Drug Cooperative, Inc. ("RDC" or "Plaintiff") is a pharmaceutical wholesaler located at 50 Jet View Drive, Rochester, New York, 14624. During the relevant period, Plaintiff purchased Norvir and Kaletra directly from Abbott, and was injured as a result of Defendant's anti-competitive conduct alleged herein.

2.    Defendant Abbott is a corporation organized and existing under the laws of the State of Illinois and having its headquarters and principal place of business located at 100 Abbott Park Road, Abbott Park, Illinois. Abbott is engaged in the development, manufacture and sale of pharmaceutical and nutritional products. Abbott has facilities in at least 14 states, including at least 3 in this District.

## JURISDICTION AND VENUE

3.    This action arises under section 2 of the Sherman Act, 15 U.S.C. § 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. 1331 and 1337(a).

4.    Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, and and Local Rules of the United States District Court for the Northern District of California 3-2 because Abbott is an inhabitant of this District or is found or transacts business

1    there and because a substantial part of the events giving rise to Plaintiff's claims occurred in this

2    District. Venue is also proper pursuant to 28 U.S.C. § 1391.

3                            **TRADE AND COMMERCE**

4            5.      The pharmaceutical products at issue in this case are sold in interstate

5    commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a

6    substantial effect upon, interstate commerce.

7                            **FACTUAL BACKGROUND**

8            6.      PIs are considered the most powerful treatment in the medical battle

9    against HIV and the disorders it causes, including acquired immune deficiency syndrome

10   ("AIDS"). These drugs work by blocking the action of protease, an enzyme needed for HIV to

11   reproduce and infect other cells.

12           7.      Although PIs present an effective treatment, they have several

13   impediments, including: pill burden, dietary requirements, and severe side effects. Each PI

14   presents different degrees of impediment and efficacy. In addition, patients develop resistance to

15   certain PIs—a significant challenge to the treatment of HIV—as the disease progresses

16           8.      There are several PIs currently on the market, including Norvir,

17   manufactured by Abbott and introduced in 1996, and Kaletra, also manufactured by Abbott and

18   introduced in 2000. Kaletra is a combination drug consisting of Norvir and another Abbott PI,

19   whose chemical or generic name is lopinavir. As explained below, while Norvir was introduced

20   as a stand-alone treatment, its principal use today is to boost the therapeutic effects (and reduced

21   the required dosage) of other PIs.

22           9.      Abbott developed Norvir with the assistance of a National Institute of

23   Health grant and spent only about $15 million of its own funds on pre-approval clinical trials for

24   the drug. By the end of 2001, Norvir had generated cumulative sales for Abbott of more than $1

25   billion.

26           10.     After Norvir's release, it was discovered that, when used in small quantities

27   with another PI, Norvir would boost the anti-viral effects of the other PI. Not only did a small

28   dose of Norvir make other PIs more effective and decrease side effects associated with high

1  doses, but it also slowed down the rate at which HIV developed resistance to the effects of PIs.

2  Norvir is the only PI known to have such properties and, as a result, for such "boosting" purposes,

3  there is no substitute for Norvir.  In addition to its direct therapeutic benefits, a regimen

4  consisting of a PI boosted by Norvir improves convenience for patients in comparison to an

5  unboosted regimen by reducing the required dosage of the PI and lessening food restrictions, both

6  important factors in ensuring adherence to HIV antiviral therapy.

7          11.    Recent research has also shown significant benefits from the use of boosted

8  PI regimens, especially for patients who experience failure of treatment regimens combining PIs

9  with other anti-HIV drugs.  Such treatment failures are marked by the emergence of drug-resistant

10  mutations that limit the benefits of other drugs in the future, because of cross-resistance among

11  HIV medications.  When patients experience failure of initial boosted PI regimens, there is no

12  evidence of resistance to other PIs and, moreover, there is less resistance to other drugs in the

13  regimen.  Hence, by using Norvir as a booster, physicians can maximize the treatment options

14  remaining for the patients experiencing treatment failure.

15          12.    Prior to the conduct alleged herein, Abbott never before sought to use its

16  intellectual property to prevent other manufacturers from creating and selling PIs for

17  administration with Norvir.  Instead, Abbott licensed—both explicitly and implicitly—

18  competitors the right to market PIs to be co-administered with Norvir.  Based on Abbott's course

19  of conduct, Abbott knowingly created the conditions for Norvir to become the de facto standard

20  boosting agent.

21          13.    As noted above, Abbott also markets Kaletra, which consists of Norvir and

22  another Abbott PI, lopinavir, combined in a single pill, i.e., Kaletra is lopinavir boosted by

23  Norvir.  Although effective and widely used, Kaletra has significant side effects, including

24  hyperlipidemia, which renders patients more vulnerable to heart attacks and strokes.

25          14.    Thus, in the "Boosting Market," Norvir is the only product available, while

26  in the "Boosted Market," Kaletra competes with other PIs, each of which is prescribed, dispensed

27  and taken in conjunction with Norvir.  This creates a situation in which the same firm participates

28  in two closely related markets, with the product sold in one of the two markets being an input or

1  component of the product sold in the other market.  If such a firm lacks competition in the market

2  for sales of the input or component product, it may be able to use its monopoly position in that

3  market to disadvantage its competitors in the related market and monopolize or attempt to

4  monopolize the related market.  That is exactly what Abbott has done here.

5                          **ABBOTT'S ANTICOMPETITIVE CONDUCT**

6          15.     Prescriptions for Kaletra rose steadily from its introduction in September

7  2000 through mid-2003, at which point it enjoyed approximately a 75% share of the boosted PI

8  market.  However, Kaletra's dominance of the boosted market was about to be threatened.

9          16.     In June 2003, Bristol-Myers Squibb introduced Reyataz, a PI designed to

10  be boosted by Norvir.  In October 2003, GlaxoSmithKline introduced Lexiva, another PI

11  designed to be boosted by Norvir.  Studies showed that, when boosted with Norvir, the new PIs

12  were as effective as Kaletra, and were more convenient.  As a result, Kaletra's share of the

13  boosted market began to decline.  The average daily dose of Norvir also fell.  Before the release

14  of Reyataz, the most common boosting dose of Norvir ranged from 200 milligrams to 400

15  milligrams per day.  However, clinical trials showed that a Norvir dose of only 100 milligrams a

16  day effectively boosted Reyataz.

17          17.     Beginning in the second half of 2003, both Reyataz and Lexiva began to

18  make steady inroads into Kaletra's share of the boosted PI market.

19          18.     Abbott was well aware of the competitive threat posed by Reyataz and

20  Lexiva and acted quickly to suppress it.  Overnight, on December 3, 2003, as part of the

21  monopolization scheme alleged herein, Abbott raised the wholesale price of Norvir by

22  approximately 400%, from $205.74 to $1,028.71 for a 120-count bottle of 100 mg capsules.

23  However, Abbott did not raise the price of Kaletra, which incorporates Norvir.  In effect, Abbott

24  raised the price of Norvir only when it is used to boost a non-Abbott PI.  By instituting this

25  enormous price hike, Abbott drastically increased the cost of regimens using Norvir to boost

26  competing PIs.  The annual cost of Norvir needed in such a regimen increased by $6,258 per year

27  for PIs such as Lexiva requiring twice-daily dose of Norvir.  For Aptivus (tipranavir), a new PI

28

1    marketed by Boehringer Ingelheim, the optimal Norvir booster dose increased by more than

2    $12,000 per year.

3            19.    Faced with the prospect of new competitors to Abbott's boosted PI,

4    Kaletra—i.e., two new PIs from GSK (Lexiva) and BMS (Reyataz)—Abbott's executive declined

5    to engage in legal and procompetitive, but potentially ineffective, approaches to defending against

6    a loss of market share.  Instead, its executives formulated an anticompetitive monopolization

7    scheme using Abbott's control of Norvir as leverage to maintain and/or enhance Kaletra's

8    dominant market position.  Abbott executives were well-aware that Abbott had facilitated the use

9    of Norvir as a booster and caused its competitors to rely on the availability of Norvir – through

10   Abbott's past course of conduct and formally through licensing its competitors to promote their

11   PIs with Norvir.  Abbott executives realized that if Abbott could make Norvir unavailable or less

12   desirable when paired with its competitors' PIs—by actually pulling it from the market or by

13   manipulating its price—then its competitors' products in the boosted market, which by that time

14   almost always relied on Norvir for boosting due to Abbott's prior conduct, would never become a

15   significant competitive threat to Kaletra's market dominance.

16           20.    As reported in the Wall Street Journal, internal Abbott documents reveal,

17   among other things, that: (a) Abbott understood the illegal nature of the price-increase scheme

18   and contemplated other strategies, like ceasing sales of Norvir, to "minimize any federal

19   investigations regarding price increases in the US"; (b) Abbott understood the adverse

20   consequences of the scheme, including that it would "tarnish" the reputation of Abbott's CEO,

21   "[p]osition [Abbott] as [a] big, bad, greedy pharmaceutical company," "[f]uel[] perception[s]

22   regarding lack of Abbott commitment to HIV," and create a "[b]acklash from [the] advocacy

23   community, legislators, [and] physicians"; and (c) Abbott floated pretextual rationales for the

24   price increase but worried about its "[e]xposure on price if forced to open [its] books."

25           21.    According to internal Abbott emails and other documents released by the

26   Wall Street Journal, one Abbott executive explained Abbott's concern in the following manner:

27   Abbott could not "continue to trade a prescription of Kaletra for a prescription of Norvir at 100

28   mg."  Rather than rely on any competitive advantage in the medicinal characteristics of Kaletra,

1    or even on lowering Kaletra's price so that it was more attractive to patients, this executive

2    outlined alternative anticompetitive plans that had been discussed among Abbott management and

3    warned other senior Abbott employees not to be "stunned by the outcome of the thought process."

4          22.    But the emails are stunning. First, they outlined two potential scenarios for

5    increasing the price of Norvir in an effort artificially to decrease demand for its competitors' PIs.

6    In both scenarios, they suggested leaving the price of Kaletra unchanged, thus giving Abbott a

7    huge price advantage for PIs boosted by Norvir. They outlined a "rationale" for the proposed

8    Norvir price increase, suggesting that Abbott mislead the public into believing that "it is no

9    longer feasible for Abbott to provide a production line of Norvir capsules at the current price."

10   The emails, however, frankly admit the "weakness" of this "rationale"—its falsity.

11         23.    Even more cynically, the Abbott emails suggested an alternative approach

12   to the price increase: withdraw Norvir capsules from the market entirely, leaving HIV patients

13   only with a liquid form of Norvir that Abbott's own executives admit "taste[s] like someone

14   else's vomit." Other materials reveal that Abbott planned to make up a justification for this

15   withdrawal. Executives considered misleading the public into believing that Abbott was diverting

16   the capsules for humanitarian efforts in "the developing world (i.e. Africa)."

17         24.    An Abbott slide presentation created around the time of these emails

18   further illustrates the anticompetitive and illegitimate motives behind Abbott's price hike. The

19   presentation reveals, for example, that Abbott sought to "[p]osition Kaletra as a more economical

20   option for boosted ARV [anti-retroviral] therapy." Abbott acknowledged the illegitimacy of its

21   plan, but Abbott still found it easier to mislead the public regarding an anticompetitive price

22   increase than to try to explain a complete withdrawal of Norvir capsules from the market.

23         25.    Abbott further attempted to manage the fallout from its Norvir price

24   increase by publishing misleading comparisons of PI prices. In promotional and informational

25   materials about Norvir after the price increase, Abbott represented that Norvir was the lowest-

26   priced PI on the market.

27         26.    The Department of Health & Human Services ("DHHS") responded with a

28   Warning Letter to Abbott about such materials, calling Abbott's price comparison chart "false or

1   misleading in violation of section 502(a) of the Federal Food, Drug, and Cosmetic Act (Act) (21

2   U.S.C. 352(a))." Specifically, DHHS stated that the price chart was misleading because it

3   compared a "subtherapeutic dose of Norvir (100 mg once daily) to the labeled dosing regimens of

4   other antiretroviral agents" and it "implies that Norvir may be used other than in combination

5   therapy, when it is not labeled for such use." Abbott did not contest the FDA letter, choosing

6   instead to send a letter to healthcare providers retracting and "clarifying" its false statements.

7          27.    On information and belief, internal Abbott documents state Abbott's

8   intentions: the huge price increase for Norvir would create the "[p]otential for increased market

9   share for Kaletra." Abbott's December 3, 2003 price increase was an attempt to leverage its

10  monopoly position in the boosting market in order to disadvantage competitors and maintain its

11  dominant position in the boosted market. The attempt succeeded.

12         28.    Abbott's leveraging scheme effectively halted the decline in market share

13  of Kaletra. By 2006, Kaletra's share of the boosted PI market had risen to approximately 75%,

14  the same share it held prior to the introduction of Reyataz. This change of course was due

15  entirely to the competitive disadvantage imposed on non-Abbott PIs by the December 2003 price

16  increase.

17         29.    As a direct and proximate result of Abbott's unlawful conduct, plaintiff

18  RDC and other similarly situated direct purchasers have been deprived of the benefit of free and

19  open competition in the boosted PI market and have been injured in their business and property

20  by paying more for the relevant Abbott drugs than they would have in the absence of Abbott's

21  unlawful, anticompetitive conduct.

22                              **RELEVANT MARKETS**

23         30.    There are two product markets relevant to Plaintiffs' antitrust claims: the

24  Boosting Market, which consists of Norvir alone, and the Boosted Market, which consists of

25  Kaletra and a number of non-Abbott PIs, each of which is prescribed, dispensed and used in

26  conjunction with Norvir. The relevant geographic market is the United States. With respect to

27  both product markets, a firm that was the only seller of such products in the United States would

28

739233.1                              - 8 -                    CLASS ACTION COMPLAINT

1    have the ability to profitably sell those products at a price substantially above the competitive

2    level without losing significant sales.

3        31.    At all relevant times, Abbott has had a 100% share of the Boosting market

4    and a dominant share of the Boosted market. At all relevant times, Abbott possessed monopoly

5    power—the ability to profitably raise price significantly above competitive level without losing

6    significant sales—in both relevant markets.

7        32.    There are barriers to entry in both the market for PI boosters and the

8    market for boosted PIs. The products in these markets require millions of dollars and years to

9    design, develop, and distribute. Compounding these barriers to entry, both markets require

10   government approvals to enter and are may be covered by patents and other forms of intellectual

11   property. Thus, competitors or potential market entrants lack the capacity to increase output in

12   the short run.

13       33.    The unlawful actions alleged above were taken for the purpose of

14   maintaining Abbott's dominant share of the Boosted market.

15                          **CLASS ACTION ALLEGATIONS**

16       34.    Plaintiff brings this action on its own behalf and under Fed. R. Civ. P.

17   23(a) & (b)(3), as representative of a class (the "Class") defined as follows:

18          All persons or entities in the United States that purchased Norvir
            and/or Kaletra directly from Abbott or any of its divisions,
19          subsidiaries, predecessors, or affiliates during the period from
            December 3, 2003 through such time as the effects of Abbott's
20          illegal conduct have ceased, and excluding federal governmental
            entities, Abbott, and Abbott's divisions, subsidiaries, predecessors,
21          and affiliates.

22       35.    On information and belief, hundreds of entities in the United States have

23   purchased Norvir and/or Kaletra directly from Abbott. Thus, members of the Class are so

24   numerous that joinder is impracticable.

25       36.    Plaintiff's claims are typical of those of the Class.

26       37.    Plaintiff and all members of the Class were damaged by the same conduct

27   of the Defendant.

28

739233.1                          - 9 -                    CLASS ACTION COMPLAINT

1    38.    Plaintiff will fairly and adequately protect and represent the interests of the

2    Class. The interests of the Plaintiff are not antagonistic to the Class.

3    39.    Plaintiff is represented by counsel who are experienced and competent in

4    the prosecution of complex class action antitrust litigation.

5    40.    Questions of law and fact common to the members of the Class

6    predominate over questions, if any, that may affect only individual members because Defendant

7    has acted and refused to act on grounds generally applicable to the entire Class. Such generally

8    applicable conduct is inherent in the Defendant's exclusionary and anticompetitive conduct in

9    monopolizing and attempting to monopolize the boosted PI market, as more fully alleged herein.

10    41.    Questions of law and fact common to the Class include:

11            a.    whether the Defendant intentionally and unlawfully excluded

12    competitors from the Boosted Market;

13            b.    whether Abbott unlawfully attempted to monopolize the Boosted

14    Market during the Class Period;\

15            c.    whether Abbott engaged in anticompetitive conduct in order to

16    leverage its monopoly in the Boosting Market to obtain, maintain, or extend monopoly power in

17    the Boosted Market;

18            d.    whether the geographic market for both protease inhibitor boosters

19    and boosted protease inhibitors is the United States;

20            e.    whether Abbott has monopoly power in a relevant market defined

21    as the Boosting Market;

22            f.    whether Abbott intended to monopolize the Boosted Market or to

23    maintain or extend an existing monopoly on the Boosted Market, and in fact maintained or

24    extended monopoly power in the Boosted market;

25            g.    whether there was and is a dangerous probability that Abbott would

26    succeed in monopolizing the Boosted Market;

27            h.    whether Abbott had pro-competitive reasons for its conduct;

28

739233.1                                    - 10 -                          CLASS ACTION COMPLAINT

1                        i.        the effects of Abbott's attempted monopolization on prices of

2  boosted protease inhibitors;

3                        j.       whether Plaintiff and other members of the Class have been

4  damaged by paying more for the relevant drugs as a result of Defendant's unlawful behavior; and,

5                        k.       the proper measure of damages.

6              42.      Class action treatment is a superior method for the fair and efficient

7  adjudication of the controversy, in that, among other things, such treatment will permit a large

8  number of similarly situated persons to prosecute their common claims in a single forum

9  simultaneously, efficiently, and without the unnecessary duplication of effort and expense that

10  numerous individual actions would engender. The benefits of proceeding through the class

11  mechanism, including providing injured persons or entities with a method for obtaining redress

12  for claims that might not be practicable for them to pursue individually, substantially outweigh

13  any difficulties that may arise in management of this class action.

14              43.      Plaintiff knows of no difficulty to be encountered in the maintenance of

15  this action as a class action.

16  **FIRST CAUSE OF ACTION**
    **Monopolization (15 U.S.C. § 2)**

17

18              44.      Plaintiff incorporates by reference the allegations contained in paragraphs 1

19  through 43 above.

20              45.      At all relevant times, Abbott has had monopoly power in both the Boosting

21  Market and the Boosted Market.

22              46.      Abbott has willfully maintained its monopoly power in the Boosted Market

23  through exclusionary and anticompetitive means. As described in more detail above, Abbott

24  induced competitors in the Boosted Market to rely upon Norvir, then overnight raised the price of

25  Norvir by approximately 400% in December 2003, and maintained that inflated price to the

26  present day. Norvir is sold at a much lower price when used as one component of Abbott's own

27  boosted PI, Kaletra. By engaging in this conduct, and instituting such a price increase, Abbott

28  has used its monopoly position in the Boosting Market to gain an artificial competitive advantage

739233.1                      - 11 -                 CLASS ACTION COMPLAINT

1    and unfairly disadvantage its competitors in the Boosted Market. The purpose and effect of

2    Abbott's conduct have been to suppress rather than promote competition on the merits.

3        47.    There is no procompetitive justification for Abbott's conduct.

4        48.    Plaintiff has been injured in its business and property by reason of Abbott's

5    unlawful monopolization. Plaintiff's injury consists of paying higher prices to purchase the

6    relevant products than it would have paid absent Abbott's conduct. This injury to Plaintiff's

7    business and property is injury of the type the antitrust laws were designed to prevent and flows

8    from that which makes Abbott's conduct unlawful.

9                        **SECOND CAUSE OF ACTION**
                         <u>**Attempt to Monopolize (15 U.S.C. § 2)**</u>
10

11        49.    Plaintiff incorporates by reference the allegations contained in paragraphs 1

12    through 43 above.

13        50.    At all relevant times, Abbott has had monopoly power in the Boosting

14    Market and, in the alternative, a dangerous probability of achieving monopoly power in the

15    Boosted Market.

16        51.    Abbott has attempted to monopolize the Boosted Market through

17    exclusionary and anticompetitive means. As described in more detail above, Abbott induced

18    competitors in the Boosted Market to rely upon Norvir, then overnight raised the price of Norvir

19    by approximately 400% in December 2003, and maintained that inflated price to the present day.

20    Norvir is sold at a much lower price when used as one component of Abbott's own boosted PI,

21    Kaletra. By engaging in this conduct, and instituting such a price increase, Abbott has used its

22    monopoly position in the Boosting Market to gain an artificial competitive advantage and unfairly

23    disadvantage its competitors in the Boosted Market. The purpose and effect of Abbott's conduct

24    have been to suppress rather than promote competition on the merits.

25        52.    At all relevant times, Abbott has had the specific intent to monopolize the

26    Boosted Market.

27        53.    There is no procompetitive justification for Abbott's conduct.

28

739233.1                              - 12 -

1    54.    Plaintiff has been injured in its business and property by reason of Abbott's

2    unlawful attempted monopolization. Plaintiff's injury consists of paying higher prices to

3    purchase the relevant products than it would have paid absent Abbott's conduct. This injury to

4    Plaintiff's business and property is injury of the type the antitrust laws were designed to prevent

5    and flows from that which makes Abbott's conduct unlawful.

6                                **PETITION FOR RELIEF**

7            WHEREFORE, Plaintiff petitions that:

8            a.    The Court determine that this action may be maintained as a class

9    action pursuant to Fed. R. Civ. P. 23, that Plaintiff be appointed class representative, and that

10   Plaintiff's counsel be appointed a counsel for the Class;

11           b.    The conduct alleged herein be declared, adjudged and/or decreed to

12   be unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2;

13           c.    Plaintiff and the Class recover their overcharge damages, trebled,

14   and the costs of the suit, including reasonable attorneys' fees as provided by law; and

15           d.    Plaintiff and the Class be granted such other, further, and different

16   relief as the nature of the case may require or as may be determined to be just, equitable and

17   proper by this Court.

18

19   Dated: November 27, 2007                    LIEFF, CABRASER, HEIMANN &
                                                 BERNSTEIN, LLP
20

21                                               By:

22                                                       Joseph R. Saveri

23                                               Joseph R. Saveri (State Bar No. 130064)
                                                 jsaveri@lchb.com
24                                               LIEFF, CABRASER, HEIMANN &
                                                 BERNSTEIN, LLP
25                                               Embarcadero Center West
                                                 275 Battery Street, 30th Floor
26                                               San Francisco, CA 94111-3339
                                                 Telephone: (415) 956-1000
27                                               Facsimile: (415) 956-1008

28

739233.1                        - 13 -                    CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BERGER & MONTAGUE, P.C.

By: _Daniel Berger By, JRS_
      Daniel Berger

Daniel Berger
*dberger@bm.net*
Eric L. Cramer
*ecramer@bm.net*
David F. Sorensen
*dsorensen@bm.net*
John D. Radice
*jradice@bm.net*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

LAW OFFICES OF JOSHUA P. DAVIS

By: _Joshua P. Davis By JPS_
      Joshua P. Davis

Joshua P. Davis (State Bar No. 193254)
*davisj@usfca.edu*
LAW OFFICES OF JOSHUA P. DAVIS
437A Valley Street
San Francisco, CA 94131
(415) 422-6223

*Attorneys for Plaintiff*
*Rochester Drug Co-Operative, Inc.*

1

## JURY TRIAL DEMAND

2          Plaintiff demands a trial by jury of all issues so triable.

3    Dated: November 27, 2007                    LIEFF, CABRASER, HEIMANN &
                                                 BERNSTEIN, LLP
4

5
                                                 By:
6                                                        Joseph R. Saveri

7
                                                 Joseph R. Saveri (State Bar No. 130064)
8                                                *jsaveri@lchb.com*
                                                 LIEFF, CABRASER, HEIMANN &
9                                                BERNSTEIN, LLP
                                                 Embarcadero Center West
10                                               275 Battery Street, 30th Floor
                                                 San Francisco, CA 94111-3339
11                                               Telephone: (415) 956-1000
                                                 Facsimile: (415) 956-1008
12

13                                               BERGER & MONTAGUE, P.C.

14
                                                 By:
15                                                       Daniel Berger

16

17                                               Daniel Berger
                                                 *dberger@bm.net*
18                                               Eric L. Cramer
                                                 *ecramer@bm.net*
19                                               David F. Sorensen
                                                 *dsorensen@bm.net*
20                                               John D. Radice
                                                 *jradice@bm.net*
21                                               BERGER & MONTAGUE, P.C.
                                                 1622 Locust Street
22                                               Philadelphia, PA 19103
                                                 Tel: (215) 875-3000
23                                               Fax: (215) 875-4604

24

25

26

27

28

739233.1                          - 15 -                    CLASS ACTION COMPLAINT

1

LAW OFFICES OF JOSHUA P. DAVIS

2

3   By: _____ By JPD
                    Joshua P. Davis

4

5       Joshua P. Davis (State Bar No. 193254)
        *davisj@usfca.edu*
6       LAW OFFICES OF JOSHUA P. DAVIS
        437A Valley Street
7       San Francisco, CA 94131
        (415) 422-6223

8
        *Attorneys for Plaintiff*
9       *Rochester Drug Co-Operative, Inc.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

739233.1                         - 16 -                    CLASS ACTION COMPLAINT