REDACTED

1   Joseph R. Saveri (SBN 130064)
    jsaveri@lchb.com
2   Eric B. Fastiff (SBN 182260)
    efastiff@lchb.com
3   Brendan Glackin (SBN 199643)
    bglackin@lchb.com
4   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    Embarcadero Center West
5   275 Battery Street, 30th Floor
    San Francisco, CA 94111-3339
6   Telephone: (415) 956-1000
    Facsimile: (415) 956-1008
7

8   *Attorneys for Individual and Representative Plaintiff*
    *Rochester Drug Co-Operative, Inc.*

9   Charles M. Kagay (SBN 073377)
    cmk@slksf.com
10  SPIEGEL, LIAO & KAGAY
    388 Market Street, Suite 900
11  San Francisco, CA 94111
    Telephone: (415) 956-5959
12  Facsimile: (415) 362-1431

13  *Attorneys for Individual and Representative Plaintiff*
    *Louisiana Wholesale Drug Company, Inc.*
14
    [Additional Attorneys and Plaintiffs listed on Signature
15  Page]

16

17              UNITED STATES DISTRICT COURT

18            NORTHERN DISTRICT OF CALIFORNIA

19                  (OAKLAND DIVISION)

20

21  MEIJER, INC. & MEIJER
    DISTRIBUTION, INC., on behalf of
22  themselves and all others similarly
    situated,
23
                Plaintiffs,
24
    v.
25
    ABBOTT LABORATORIES,
26
                Defendant.
27
28  --[caption continues next page]--

Case No. C 07-5985 CW

**PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

Date:          **March 6, 2008**
Time:          **2:00 p.m.**
Courtroom:     **2 (4th Floor)**
Judge:         **Hon. Claudia Wilken**

ROCHESTER DRUG CO-
OPERATIVE, INC., on behalf of itself
and all others similarly situated,

                    Plaintiff,

         v.

ABBOTT LABORATORIES,

                    Defendant.

Case No. C 07-6010 CW

**PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

Date:          **March 6, 2008**
Time:          **2:00 p.m.**
Courtroom:     **2 (4th Floor)**
Judge:         **Hon. Claudia Wilken**

LOUISIANA WHOLESALE DRUG
COMPANY, INC., on behalf of itself
and all others similarly situated,

                    Plaintiff,

         v.

ABBOTT LABORATORIES,

                    Defendant.

Case No. C 07-6118 CW

**PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

Date:          **March 6, 2008**
Time:          **2:00 p.m.**
Courtroom:     **2 (4th Floor)**
Judge:         **Hon. Claudia Wilken**

## DIRECT PURCHASER CLASS PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY OF ARGUMENT | 1 |
| STATEMENT OF THE CASE | 6 |
| ARGUMENT | 9 |
|    I.   The Consolidated Amended Complaint Satisfies *Twombly* | 9 |
|       A.   *Twombly* Did Not Alter Federal Pleading Standards | 9 |
|       B.   The Complaint Meets and Exceeds the Requirements of Rule 8 | 11 |
|       C.   Plaintiffs Adequately Plead Satisfaction of *Cascade* | 12 |
|    II.   Plaintiffs' *Cascade* Allegations Are Not Only Plausible, But Confirmed By the Record Reviewed to Date | 15 |
|    III.   Plaintiffs Sufficiently Plead Monopolization of the Boosting Market | 18 |
| CONCLUSION | 22 |

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4

Airborne Beepers & Video, Inc. v. AT&T Mobility LLC,
    499 F.3d 663 (7th Cir. Aug. 24, 2007) .......................................................... 10

5

Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,
    472 U.S. 585 (1985) .......................................................................... 7, 19

6

Bell Atlantic Corporation v. Twombly,
    127 S. Ct. 1955 (2007) ................................................................... 4, 9, 10

7

8

Brickey v. Dolencorp, Inc.,
    244 F.R.D. 176 (W.D.N.Y. August 29, 2007) ............................................ 10

9

Cascade Health Solutions v. PeaceHealth,
    --- F.3d ---, 2008 WL 269506 (9th Cir. February 01, 2008) .................. 2, 12, 13, 14

10

11

D.E. Rogers Assocs. v. Gardner-Denver Co.,
    718 F.2d 1431 (6th Cir. 1983) ................................................................ 14

12

E.E.O.C. v. Concentra Health Services, Inc.,
    496 F.3d 773 (7th Cir. 2007) ................................................................. 11

13

14

Erickson v. Pardus,
    127 S. Ct. 2197 (2007) ......................................................................... 10

15

Image Tech. Servs. v. Eastman Kodak Co.,
    125 F.3d 1195 (9th Cir. 1997) .......................................................... 2, 18, 19

16

17

IMSX Health Inc. v. Ayotte,
    490 F. Supp. 2d 163 (D.N.H. 2007) ...................................................... 17, 18

18

In re Abbott Laboratories Norvir Antitrust Litig.,
    442 F. Supp. 2d 800 (N.D. Cal. 2006) ...................................................... 20

19

20

In re Cardizem CD Antitrust Litig.,
    332 F.3d 896 (6th Cir. 2003) .............................................................. 5, 21

21

In re Ciprofloxacin Hydrochloride Antitrust Litig.,
    166 F. Supp. 2d 740 (E.D.N.Y. 2001) ...................................................... 21

22

23

In re K-Dur Antitrust Litig.,
    338 F. Supp. 2d 517 (D.N.J. 2004) ......................................................... 21

24

In re Terazosin Hydrochloride Antitrust Litig.,
    352 F. Supp. 2d 1279 (S.D. Fla. 2005) ..................................................... 21

25

26

Rebel Oil Co., Inc. v. Atlantic Richfield Co.,
    133 F.R.D. 41 (D. Nev. 1990) ............................................................... 17

27

Roth v. Jennings,
    489 F.3d 499 (2d Cir. June 6, 2007) ........................................................ 11

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974) ................................................................. 10

*Silvas v. E*Trade Mortg. Corp.*,
   --- F.3d ---, 2008 WL 239422 (9th Cir. 2008) ............................ 9

*United States v. Generix Drug Corp.*,
   460 U.S. 453 (1983) ................................................................ 17

*United States v. Masonite Corp.*,
   316 U.S. 265 (1945) ................................................................ 21

*William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*,
   668 F.2d 1014 (9th Cir. 1981) ............................................ 14, 17

**RULES**

Fed. R. Civ. Pro. 11 ............................................................. 4, 15, 16

Fed. R. Civ. Pro. 12(b)(6) .......................................................... 9

Fed. R. Civ. Pro. 8 ............................................................... 10, 12

**TREATISES**

Phillip E. Areeda & Herbert Hovenkamp, III Antitrust Law
   (Little Brown & Co, rev ed. 2007) .......................................... 17

R. Bork, The Antitrust Paradox (1978) ........................................ 7

CLASS ACTION COMPLAINT

1    The plaintiffs (hereinafter the "direct class plaintiffs" or "plaintiffs") in the

2   Consolidated Amended Complaint (hereinafter the "complaint" and cited as ("¶ ___")) hereby

3   submit this joint opposition to the motion to dismiss (cited as "Abbott Mot.") filed by defendant

4   Abbott Laboratories ("Abbott") against counts and claims alleged by the direct class plaintiffs

5   only. Abbott has also separately filed an "Omnibus Motion to Dismiss Plaintiffs' Sherman Act

6   Claims Pursuant to Rule 12(b)(6)," seeking to dismiss the claims of several plaintiff groups,

7   including the direct class plaintiffs. The direct class plaintiffs respond to the Omnibus Motion

8   separately by way of Plaintiffs' Joint Omnibus Opposition to Defendant's Motion to Dismiss

9   ("Omnibus Opposition"), which is incorporated herein by reference. For the reasons set out

10  below (and in the Omnibus Opposition), Abbott's motions to dismiss should be denied.

## SUMMARY OF ARGUMENT

12    The proposed class of direct-purchaser plaintiffs consists mainly of pharmaceutical

13  wholesalers and retailers who purchased Norvir and Kaletra, brand name pharmaceuticals that

14  treat HIV, directly from defendant Abbott. (¶¶ 1-3, 47-56.) Direct class plaintiffs allege that they

15  were overcharged on these purchases because, *inter alia*, Abbott has engaged in anti-competitive

16  conduct designed to preserve and extend its monopoly power in the market for boosted protease

17  inhibitors (the "boosted market"). By quadrupling the price of Norvir overnight, Abbott

18  leveraged its monopoly in protease inhibitor boosters (the "boosting market") to obtain and/or

19  attempt to obtain monopoly power in the boosted market by impairing rivals to Abbott's Kaletra

20  product (which combines Norvir with lopinavir, Abbott's boosted protease inhibitor). In addition,

21  direct class plaintiffs allege further, and separately, that Abbott also engaged in illegal

22  anticompetitive behavior to protect its Norvir monopoly in the boosting market in advance of, and

23  in furtherance of, Abbott's scheme to monopolize the boosted market. (¶¶ 15, 18, 26-33, 34-37.)

24  As a result of this conduct, the direct class plaintiffs and other similarly-situated direct purchasers

25  paid more for Norvir and Kaletra than they would have otherwise paid, and were damaged

26  thereby. (¶ 42.)

27    Abbott now moves to dismiss the complaint. It does so despite this Court's prior

28  determinations that (a) Abbott's exclusionary conduct in the form of monopoly leveraging states a

1   claim for violation of Section 2 of the Sherman Act under, *e.g.*, *Image Tech. Servs. v. Eastman*

2   *Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), and (b) after years of investigation, Abbott's behavior

3   presents triable issues of fact. (*See* Order Denying Defendant's Renewed Motion for Summary

4   Judgment, filed July 6, 2006, in No. Civ. 04-1511 CW.)

5           Abbott's arguments depend on convincing the Court that the recent case of

6   *Cascade Health Solutions v. PeaceHealth*, --- F.3d ---, 2008 WL 269506 (9th Cir.

7   February 01, 2008) ("*Cascade*"),[1] has re-interpreted the federal antitrust laws such that the very

8   same allegations of exclusionary monopoly leveraging, which this Court has repeatedly found

9   make out a cognizable antitrust claim, are now somehow insufficient to survive a motion to

10  dismiss.

11          Abbott's *Cascade* argument is wrong. Plaintiffs refer the Court to their separately

12  filed Omnibus Opposition for their (and the other plaintiff groups') joint refutation of Abbott's

13  *Cascade* motion. The Omnibus Opposition explains why *Cascade*—a case concerning price-

14  cutting in the form of bundled *discounts*—is inapplicable here in a case about the exclusionary

15  effects of a massive price *increase*. As explained in the Omnibus Opposition, the more stringent

16  cost-based test articulated in *Cascade* addressed the Ninth Circuit's narrow concern that, because

17  discounts typically benefit consumers, the traditional Section 2 analysis might be "too quick to

18  condemn price-reducing bundled *discounts* . . ." by a monopolist. *Cascade*, 2008 WL 269506 at

19  *6 (emphasis added). The Court need look no further than the arguments in the Omnibus

20  Opposition to deny Abbott's motion.

21          Accordingly, as discussed in the Omnibus Opposition, the more stringent, cost-

22  based, test for assessing the exclusionary effects of bundled *discounting* set out in *Cascade* need

23  not be satisfied here because this case is not about discounting. Nevertheless, meeting the more

24  stringent *Cascade* test would provide a separate and independent basis to find that Abbott's

25  conduct was improperly exclusionary and had an impermissible anticompetitive effect. After

---

[1] On February 1, the Ninth Circuit issued an amended opinion superseding its prior decision at
502 F.3d 895. The new decision reflects the fact that the Ninth Circuit has certified a question of
state law to the Oregon Supreme Court. The opinion remains unchanged as it relates to the
federal claims.

1    conducting a good faith analysis of the facts and circumstances available to them, direct class

2    plaintiffs believe that they can satisfy the more stringent *Cascade* test. Thus, plaintiffs

3    specifically alleged in paragraph 41 of their complaint that, while meeting *Cascade* is

4    unnecessary, *if* the conduct were analyzed as if it were, *arguendo*, bundled discounting, and *if*

5    Kaletra (which contains both Norvir *and* Abbott's boosted product (lopinavir)) were considered a

6    discount bundle, Abbott's conduct would exclude an equally efficient competitor, and fail the

7    *Cascade* test. (¶ 41.)

8            In essence, instead of responding to competitive threats to Abbott's Kaletra

9    product by improving its quality, or lowering its price, Abbott has used its Norvir monopoly to

10   harm rivals in the boosted market, and make it impossible for competitors to steal share through

11   price competition. Even if Abbott's rivals were to lower their prices to better compete with

12   Kaletra, Abbott would need only to inflate further the price of Norvir to nullify the ability of the

13   lower-priced competitors to steal share from Kaletra. Seen from a different angle, as plaintiffs

14   have alleged, by penalizing purchasers for buying Norvir as a stand-alone product (as opposed to

15   buying it as part of the Kaletra combination product), Abbott was effectively selling the lopinavir

16   (boosted) portion of Kaletra below its costs. As a result of Abbott's leveraging of its Norvir

17   monopoly, therefore, rivals could not possibly compete with Abbott on price. In this way, Abbott

18   has harmed rivals and eliminated price competition, not by competing on the merits, but rather by

19   improperly exploiting its monopoly in the boosting market.

20           Therefore, even if the Court were to (wrongly) accept Abbott's Omnibus Motion

21   to Dismiss in its entirety, the Court would nonetheless be obliged to allow the direct class

22   plaintiffs' claims to go forward under *Cascade*. Abbott's motion to dismiss against the direct

23   class plaintiffs also fails to explain why plaintiffs' separate and distinct allegations relating to

24   monopolization of the boosting market should be dismissed at the pleadings stage.

25           Each of Abbott's principal arguments in support of its motion against the direct

26   class plaintiffs is without merit.

27           *First,* Abbott argues that the Court should simply disregard plaintiffs' allegations

28   that the *Cascade* test is satisfied. Abbott hangs its argument on a supposed lack of specificity,

1   citing *Bell Atlantic Corporation v. Twombly*, 127 S. Ct. 1955 (2007). This argument is frivolous.

2   As explained in Part I below, *Twombly* does not require plaintiffs to prove every aspect of their

3   case at the pleading stage; it only requires them to allege enough facts to put Abbott on notice of

4   the case against it—which plaintiffs clearly have. Plaintiffs have alleged, *inter alia*, the date of

5   the price increase at issue, its amount, its harmful effect on competition in the boosted market,

6   and to competition generally, its beneficial effect on Kaletra's market share and in enhancing

7   and/or maintaining Abbott's monopoly power, and, importantly, the specific satisfaction of the

8   "discount allocation" criteria set forth in *Cascade*. Such specificity is more than is required at the

9   pleading stage.

10          Moreover, Abbott's main argument is, in essence, that plaintiffs did not plead facts

11   about Abbott's own average variable costs with more specificity. Yet, neither *Twombly*, nor

12   *Erickson*, nor *Cascade*, nor any other case, supports the proposition that a plaintiff should be

13   denied all remedy for facially anticompetitive behavior simply because it did not do the

14   impossible: obtain access to the defendant's confidential, internal, proprietary cost data *before*

15   filing a complaint. Indeed, if the rule Abbott seeks to impose became law, *Cascade* would

16   effectively immunize conduct that the Ninth Circuit believed was clearly harmful to competition

17   because no plaintiff could ever get past the pleadings stage. That is clearly not the law.

18          *Second*, Abbott contends that plaintiffs' allegation that the *Cascade* test has been

19   satisfied should simply be disregarded because plaintiffs' allegations, Abbott believes, are

20   somehow implausible and thus supposedly inconsistent with plaintiffs' obligations under Rule 11.

21   (Abbott Mot. at 6.) Of course, Abbott cites no rule of pleading that requires dismissal of a

22   complaint because the defendant believes that the allegations against it conflict with its own view

23   of the evidence, nor could it. There is no such rule.

24          Further, not only is it improper for Abbott to casually wave around Rule 11

25   without actually following the procedures for lodging a complaint under that Rule, Abbott is

26   simply and flatly wrong about the plausibility of plaintiffs' allegations. Indeed, while doing the

27   economic analysis required by *Cascade* is wholly unnecessary and improper at the pleadings

28   stage of this case (or any case), as explained in Part II, *infra*, Abbott's own statements and the few

1   internal documents plaintiffs have reviewed to date show quite clearly that plaintiffs' allegations

2   in paragraph 41 are not only "plausible," but accurate.  Though unnecessary to establish at this

3   stage (given that the Court is required to accept plaintiffs' allegations as true), it is clear from the

4   evidence reviewed to date that Abbott's conduct would indeed violate the *Cascade* test.

5          What this means is that plaintiffs will be able to show that they can meet a *higher*

6   test than is required at this stage or any other, proving without a doubt that Abbott's conduct is

7   not only improperly exclusionary under *Kodak*, but would clearly exclude equally efficient

8   competitors, improperly enhance monopoly power, harm competition, and allow Abbott to charge

9   supracompetitive prices.  More specifically, plaintiffs have pled, and will show, that by using the

10  leverage inherent in its Norvir monopoly, Abbott has improperly nullified the ability of Abbott's

11  rivals to compete on the merits.  Any effort by competitors to lower price or improve quality has

12  been—and would continue to be, if permitted—met by an increase in the Norvir price, making

13  such procompetitive efforts futile, and stifling price competition generally.

14         *Third*, as explained in Part III, *infra*, plaintiffs have also more than sufficiently

15  alleged that, in advance of its plan to leverage its Norvir monopoly over to the boosted market,

16  Abbott willfully maintained and/or enhanced its monopoly power in the boosting market by

17  impeding the development of potential rivals and/or inducing a delay in the development of

18  technologies to use lesser amounts of Norvir to boost other protease inhibitors.  Abbott's only

19  argument with respect to this claim is to repeat the failed argument it made with respect to

20  plaintiffs' other claim:  that it has a patent-protected monopoly on Norvir and thus could do

21  whatever it wants with Norvir or its price.  But plaintiffs are claiming that Abbott's exclusionary

22  conduct extends *outside the scope* of its Norvir patents and improperly bolster Abbott's patent

23  rights.  As such, the conduct is clearly subject to antitrust scrutiny under well-established law.[2]

24  *See, e.g., In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 908 (6th Cir. 2003) (noting that "it is

25

26

---

27  [2] Abbott also argues that Federal Circuit precedent bars plaintiffs' monopoly leveraging claims.
    This argument should be rejected for the reasons stated at Section II.B.2 of the Omnibus
28  Opposition, which plaintiffs incorporate herein by reference.

1    one thing to take advantage of a monopoly that naturally arises from a patent, but another thing

2    altogether to bolster the patent's effectiveness in inhibiting competitors . . .").

3        Abbott's motion is without merit, and should be denied. Should the Court grant

4    any aspect of Abbott's motion, plaintiffs respectfully request leave to amend.

5                        **STATEMENT OF THE CASE**

6        The complaint alleges a classic case of monopoly leveraging: using monopoly

7    power in one market to obtain, preserve or increase power in another, related market. In 1996,

8    Abbott introduced Norvir, a protease inhibitor used to treat HIV. (¶ 11.) While introduced as a

9    stand-alone treatment, today HIV patients primarily use Norvir to enhance, or "boost," the effects

10   of other, complementary protease inhibitors. (¶ 13-15.) Norvir currently has no reasonable

11   substitute for this purpose; Abbott therefore enjoys a monopoly in the one-drug market for

12   "boosting" protease inhibitors. (¶¶ 17-18.)

13       Abbott also markets "Kaletra," a drug that combines both the active ingredient in

14   Norvir (ritonavir) and also Abbott's own "boosted" protease inhibitor, lopinavir. (¶ 16.) Through

15   mid-2003, Kaletra enjoyed more than three quarters of the market for "boosted" protease

16   inhibitors. (¶ 19.) In 2002 and 2003, however, Abbott became increasingly concerned that new,

17   competitor boosted protease inhibitors would be introduced to challenge the dominance of

18   Kaletra, which carries with it the risk of significant side effects, including increased risk of heart

19   attacks and strokes. (¶¶ 16, 20-21.) In direct response to the introduction of these competitor

20   drugs, in 2003, Abbott—overnight, on December 3, 2003—raised the price of Norvir by 400%.

21   (¶ 24.) Abbott did not raise the price of Kaletra, however. As a result of this price increase, rival

22   boosted drugs were put at a severe disadvantage. Patients seeking to use Abbott's rival boosted

23   drugs now had to pay a penalty for buying Norvir as a stand-alone product (as opposed to buying

24   it as part of Kaletra). (*Id.*)

25       Abbott specifically intended that its massive price increase would impair

26   competition to Kaletra. In the words of one executive, Abbott could not "continue to trade a

27   prescription of Kaletra for a prescription of Norvir at 100 mg," ¶ 27, and needed to "[p]osition

28   Kaletra as a more economical option for boosted ARV [anti-retroviral] therapy," ¶ 30. Notably,

1   Abbott considered other alternatives to impair its rivals, such as marketing stand-alone Norvir

2   only in a liquid form that in Abbott's executives' own words "taste[s] like someone else's vomit."

3   (¶ 29.)  Abbott also engaged in numerous other pretextual and deceptive acts to disguise its

4   activity.  (¶¶ 26-33.)

5          Abbott's conduct had its intended effect on competition in the boosted market.

6   Abbott successfully impaired the performance of boosted HIV treatments that competed with

7   Kaletra, by inflating their effective cost to patients (because Abbott's boosted rivals had to be

8   combined with the now mega-priced Norvir to be effective).  (¶ 25.)  As evidence of this effect,

9   Abbott's plan succeeded in halting the decline in Kaletra's massive market share that had

10  commenced with the attempted introduction of new, competing products.  (¶ 39.)  Abbott's

11  conduct also precluded price competition in the market for boosted protease inhibitors.  Abbott's

12  rivals knew that if they cut prices to compete with Kaletra, Abbott could thwart competition by

13  simply raising Norvir's price again (thereby nullifying the effect of any boosted price cut to steal

14  share from Kaletra).  (¶ 40.)

15         Indeed, throughout the complaint, plaintiffs allege that Abbott failed to compete on

16  the merits.  When faced with the prospect of superior products (and hence a potential loss in

17  market share) in the boosted market, the procompetitive response would have been to lower

18  Kaletra's price or improve quality or service.  *E.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing*

19  *Corp.*, 472 U.S. 585, 605 (1985) ("If a firm has been 'attempting to exclude rivals on some basis

20  other than efficiency,' it is fair to characterize its behavior as predatory.") (quoting R. Bork, The

21  Antitrust Paradox 138 (1978)).  Plaintiffs specifically plead that Abbott could have responded in a

22  procompetitive manner by lowering Kaletra's price or developing an improved formulation of

23  Kaletra or an entirely new and more effective boosted protease inhibitor instead.  But, Abbott did

24  not respond procompetitively.  Rather, Abbott *raised* the price of Norvir, a necessary component

25  in the treatment regimes of competing boosted protease inhibitors, by several orders of

26  magnitude, thereby punishing consumers and producers of competing boosted products.

27         As further proof of the anticompetitive effect of the Norvir price increase, the

28  complaint alleges that:

- 7 -

1    The following allegations are sufficient, but not necessary, to state a

2    claim. On information and belief: (a) if the penalty a purchaser

     would pay on the required dosage of Norvir for buying a Boosted-

3    PI from a supplier other than Abbott were subtracted from the

     imputed price of the Boosted-PI portion of Kaletra, then the

4    resulting price would be below Abbott's average variable costs

     relating to the Boosted-PI portion of Kaletra; and (b) if Abbott had

5    to pay its own market price for the ritonavir/Norvir that goes into

     Kaletra, Abbott's selling Kaletra at its current market price would

6    not be profitable.

7    (¶ 41.)

8         Meanwhile, in advance of its efforts to leverage its Norvir monopoly over to the

9    boosted market, Abbott had also engaged in anticompetitive behavior to maintain and enhance its

10   monopoly in the boosting market. This power maintained in the boosting market furthered the

11   exclusionary power of the leveraging scheme, because it meant that Abbott's boosted rivals

12   would continue to be singularly reliant upon Norvir. Specifically, the complaint further alleges

13   that Abbott maintained its monopoly power in the boosting market by departing from its well-

14   established course of licensing and selling Norvir to other manufacturers of boosted protease

15   inhibitors at a reasonable price. (¶ 34-38.) Abbott further abused its monopoly power in the

16   boosting market by intentionally inducing its competitors into relying on Norvir's availability at

17   Abbott's standard price and then suddenly increasing that price by more than 400%. Abbott

18   developed this reliance by licensing to competitors – implicitly and explicitly – the right to

19   market boosted protease inhibitors to be co-administered with Norvir. (Id.)

20        However, at the same time it was actively pursing licenses for Norvir, Abbott was

21   also planning to change its established course of dealing by limiting Norvir's availability, by

22   either removing it from the market altogether or drastically increasing its price to make it

23   financially difficult to obtain (especially relative to purchasing Norvir as part of Abbott's

24   Kaletra). Abbott did not disclose these plans to its actual or potential licensees, preferring that

25   rivals continue to rely on Norvir, thereby further establishing Norvir as the *de facto* standard

26   boosting agent. This conduct enhanced the ability of Abbott to leverage its Norvir monopoly and

27   obtain monopoly power in the boosted market. Abbott's deceptive behavior deterred would-be

28   competitors in the boosting market from developing potential boosting drugs to compete with

1   Norvir and/or PIs that required a smaller dosage of Norvir. (¶¶ 15, 18, 26–33, 34–37.)  For

2   instance, as a result of Abbott's misconduct GlaxoSmithKline did not obtain FDA approval for

3   use of its boosted protease inhibitor (Lexiva) with a lower dosage of Norvir (100mg).  (¶ 37.)

4   Had boosted drugs worked with lower doses of Norvir earlier, Abbott's ability to leverage its

5   Norvir monopoly over to the boosted market would have been less effective.

6           In sum, Abbott's conduct, taken as a whole, caused members of the plaintiff class

7   to pay more for Norvir and Kaletra than they would have, had Abbott engaged in lawful

8   competition (such as by competing in the boosted market by lowering the price of Kaletra).

9   (¶ 71.)

10                                  **ARGUMENT**

11  **I.    The Consolidated Amended Complaint Satisfies _Twombly_**

12          Abbott first contends that under _Bell Atlantic Corporation v. Twombly_, 127 S. Ct.

13  1955 (2007), paragraph 41 of plaintiffs' complaint lacks sufficient specificity and therefore must

14  be ignored.  To the contrary, both the complaint as a whole, and paragraph 41 in particular,

15  contain specific allegations of exclusionary behavior that more than adequately state a claim

16  under prevailing law, even if _Cascade_ were held to apply. Moreover, plaintiffs' ability to show

17  that a more stringent than legally required, cost-based _Cascade_ test for assessing exclusionary

18  conduct can be and has been met is further evidence that the conduct at issue harms competition

19  and violates the antitrust laws.

20  **A.    _Twombly_ Did Not Alter Federal Pleading Standards**

21          First, contrary to Abbott's contentions, _Twombly_ did not alter the basic rules

22  governing Rule 12(b)(6) motions:  "All allegations of material fact are taken as true and construed

23  in the light most favorable to the nonmoving party."  _Silvas v. E*Trade Mortg. Corp._, --- F.3d ---,

24  2008 WL 239422, *2 (9th Cir. 2008).  "A complaint must not be dismissed unless it appears

25  beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle

26  the plaintiff to relief."  _Id._

27          In _Twombly_ the plaintiffs had alleged an illegal horizontal agreement among

28  competitors that had occurred at some unspecified place and time in the past.  _Twombly_, 127 S.

1   Ct. at 1965-66. The purported competitors (the regional bell operating companies or "baby

2   Bells") had, according to the plaintiffs, simply failed to expand beyond the "legacy" geographic

3   markets in which they had previously enjoyed regulatory monopolies. The Supreme Court held

4   in *Twombly* that this simple allegation of lawful, parallel behavior did not state a claim. *Id.* at

5   1966. Hence, the Court held,

> When allegations of parallel conduct are set out in order to make a
> § 1 claim, they must be *placed in a context* that raises a suggestion
> of a preceding agreement, not merely parallel conduct that could
> just as well be independent action.

9   *Id.* (emphasis added). The Court made sure to clarify, however that:

> Asking for plausible grounds to infer an agreement does not impose
> a probability requirement at the pleading stage; it simply calls for
> enough facts to raise a reasonable expectation that discovery will
> reveal evidence of illegal agreement.

13   *Id.* at 1965. The Court also observed that a case should proceed even if proof of the alleged

14   violation is improbable, and 'that a recovery is very remote and unlikely.' *Id.* (quoting *Scheuer v.*

15   *Rhodes*, 416 U.S. 232, 236 (1974)).

16         In *Erickson v. Pardus*, decided after *Twombly*, the Supreme Court confirmed that a

17   plaintiff need only satisfy the notice pleading requirements of Rule 8: "[s]pecific facts are not

18   necessary, the statement [of a claim] need only give the defendant fair notice of what the . . .

19   claim is and the grounds upon which it rests." 127 S. Ct. 2197, 2200 (2007) (citing *Twombly*)

20   (internal quotations marks omitted).

21         Moreover, decisions interpreting *Twombly* and *Erickson* have hewed strictly to

22   their collective admonition that the Supreme Court did not intend to create a new, heightened

23   pleading standard for antitrust cases, and that notice pleading remains the rule in federal court.

24   *See Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. Aug. 24,

25   2007) ("Taking *Erickson* and *Twombly* together, we understand the Court to be saying only that at

26   some point the factual detail in a complaint may be so sketchy that the complaint does not provide

27   the type of notice of the claim to which the defendant is entitled under Rule 8."); *Brickey v.*

28   *Dolencorp, Inc.*, 244 F.R.D. 176, 178 (W.D.N.Y. August 29, 2007) (holding that *Twombly* does

- 10 -

1    not require plaintiffs to "concretely prove all of the specifics"); *Roth v. Jennings*, 489 F.3d 499,

2    515 (2d Cir. June 6, 2007) (rejecting the need for detailed allegations); *E.E.O.C. v. Concentra*

3    *Health Services, Inc.*, 496 F.3d 773, 779 (7th Cir. 2007) (noting that the "fair notice" language of

4    *Conley* and *Twombly* was a "classic verbal formula" that "capture[d] a mood of liberal pleading

5    that is enough to settle the sufficiency of most federal complaints") (internal quotation marks and

6    citations omitted).  In sum, contrary to the basis of Abbott's motion, *Twombly* does not

7    fundamentally alter the pleading standards for antitrust cases.

8    **B.**    **The Complaint Meets and Exceeds the Requirements of Rule 8**

9         Second, even if *Twombly* had, *arguendo*, created a heightened pleading standard,

10   plaintiffs' complaint would satisfy it.  Abbott's criticism that the complaint advances only a

11   "barebones allegation" of exclusionary pricing is wholly without merit.  To the contrary, plaintiffs

12   allege that Abbott responded to the threat posed to its monopoly power in the boosted market by

13   quadrupling prices for Norvir on December 3, 2003 (¶ 24); that Abbott did so with the specific

14   intent of making Abbott's rival products in the boosted market more expensive to use (because

15   they had to be used in conjunction with Norvir), and thereby improperly impairing those rivals'

16   ability to compete with Kaletra, not by lowering Kaletra's price or improving Kaletra's quality,

17   but through leveraging monopoly power.  This conduct, plaintiffs allege, enhanced Kaletra's

18   market share and monopoly power.  (¶ 26.)  Plaintiffs allege further that Abbott executives stated

19   they raised prices on Norvir because "Abbott could not 'continue to trade a prescription of

20   Kaletra for a prescription of Norvir,'" ¶ 27—*i.e.*, Abbott would not countenance any eroding of

21   its market share in the boosted market; and that Abbott invented deceptive and pretextual

22   explanations for its extraordinary price-hike, ¶¶ 28-32.

23        Moreover, plaintiffs plead further that Abbott's conduct harmed competition in the

24   boosted market, halting and then reversing Kaletra's decline in market share and allowing Abbott

25   to charge supracompetitive prices.  (¶ 24.)  Finally, plaintiffs alleged that if Kaletra were

26   considered a "bundle" of Norvir and lopinavir, and if the price of Norvir/ritonavir "bundled" with

27   liponavir as part of Kaletra was (counterfactually) considered a "discount," the test could be

28   applied, and if applied, satisfied.  Plaintiffs specifically plead that if the new, quadrupled price of

1    Norvir as a stand-alone product were subtracted from the price of Kaletra, it would render the

2    imputed price of the lopinavir component of Kaletra below Abbott's average variable costs. (¶

3    41.)

4              Thus, plaintiffs adequately and sufficiently plead satisfaction of the actual test set

5    out in *Cascade*, which is all that is and should be required at the pleading stage. Moreover,

6    plaintiffs allege facts that more than plausibly suggest that Abbott quadrupled the price of Norvir

7    with the intent and actual effect of impairing and/or excluding competition in the boosted market.

8    Abbott was certainly able to understand plaintiffs' allegations in this regard, having summarized

9    plaintiffs' paragraph 41 as follows: "In other words, the Meijer Plaintiffs claim that when you

10   take out the cost of the Norvir component of Kaletra after the price increase, Abbott is offering

11   the 'boosted' (or lopinavir) component of Kaletra at a price that falls below its costs of producing

12   that component." (Abbott Mot. at 4.) As long as "producing" in that sentence includes average

13   variable costs, such as marketing and distribution, Abbott has precisely understood plaintiffs'

14   very specific allegation. Rule 8 therefore clearly has been satisfied. Abbott's motion therefore

15   must be denied.

16   **C.    Plaintiffs Adequately Plead Satisfaction of *Cascade***

17            Abbott's real "grievance" about the complaint appears to be that even though

18   plaintiffs plead satisfaction of the *Cascade* test, plaintiffs did not "show their work" and lay out

19   all of the steps of the actual computation, including specific allegations regarding Abbott's actual

20   average variable costs to the penny (even though, as Abbott itself has acknowledged, plaintiffs'

21   allegations implicitly incorporate allegations about Abbott's pricing).

22            Unsurprisingly, Abbott fails to cite a single case dismissing at the pleading stage

23   an allegation of pricing below appropriate measures of cost. *Cascade* itself reviewed a district

24   court's opinion on summary judgment and after trial. *Cascade*, 2008 WL 269506 at *2. At the

25   summary judgment (or trial) stage, plaintiffs will have had the benefit of discovery, and the

26   assistance of expert analysis, to pinpoint Abbott's average variable costs with specificity. At this

27   early stage, when plaintiffs' allegations must be read in the light most favorable to plaintiffs, no

28   more is necessary than plaintiffs' well-founded allegations in paragraph 41.

1    Indeed, the detailed and factual nature of this inquiry makes it especially

2 inappropriate to analyze at the pleadings stage. In *Cascade*, the Ninth Circuit held that "[t]o

3 prove that a bundled discount was exclusionary or predatory for the purpose of a . . . [Section 2]

4 claim, the plaintiff must establish that, after allocating the discount given by the defendant on the

5 entire bundle of products to the competitive product or products, the defendant sold the

6 competitive product or products below its average variable cost of producing them." *Cascade*,

7 2008 WL 269506 at *18. And, plaintiffs explicitly plead that, if the *Cascade* test applies,

8 Abbott's exclusionary pricing scheme meets its criteria for anticompetitive conduct. As plaintiffs

9 allege:

10         The following allegations are sufficient, but not necessary, to state a
           claim. On information and belief: (a) if the penalty a purchaser
11         would pay on the required dosage of Norvir for buying a Boosted-
           PI from a supplier other than Abbott were subtracted from the
12         imputed price of the Boosted-PI portion of Kaletra, then the
           resulting price would be below Abbott's average variable costs
13         relating to the Boosted-PI portion of Kaletra; and (b) if Abbott had
           to pay its own market price for the ritonavir/Norvir that goes into
14         Kaletra, Abbott's selling Kaletra at its current market price would
           not be profitable.
15

16 (¶ 41.)

17    Plaintiffs allege, in other words, that if the Court were to find that *Cascade* applies

18 and Kaletra were viewed as if it were a "discount bundle" of Abbott's boosting and boosted

19 drugs, the *Cascade* test would be satisfied. In other words, by raising the price of Norvir when

20 purchased separately from Kaletra, and then keeping the price of Kaletra stable, Abbott

21 effectively sells Norvir/ritonavir at a much higher price when it is purchased separately from

22 Abbott's Kaletra "bundle."

23    To apply *Cascade* here, therefore, the relevant inquiry would be as follows: (a)

24 take the price that a customer would have to pay for the Norvir in Kaletra if bought separately,

25 and (b) subtract the amount determined in "a" from the price of Kaletra to get the effective price

26 at which Abbott is selling lopinavir (the "imputed lopinavir price"), the boosted part of Kaletra.

27 One would then take the imputed lopinavir price computed in "b" and compare that to the average

28 variable costs associated with Abbott's sales of its boosted product. If Abbott's own average

1    variable costs are higher than the imputed price for which it is selling lopinavir (and conversely,

2    Abbott's imputed price is below the relevant costs), then Abbott is selling at a price that violates

3    *Cascade*. Abbott does not disagree with this formulation of the test or how it should be applied

4    here. (*See* Abbott Mot. at 6.)  That is precisely what plaintiffs did and what plaintiffs have pled.

5    Nothing more is or could be reasonably required at this stage of the case.

6            To the extent Abbott takes issue with plaintiffs' satisfaction of the test, that debate

7    can not and should not occur *before* discovery of Abbott's financial records and in advance of

8    expert analysis.  For one, the categorization of expenses as variable or fixed (as one must do in

9    order to conduct the *Cascade* analysis) is dependent on "the actual situation [of] the seller," and

10   thus "is impossible to determine in advance and outside the specific factual context . . . [.]" *D.E.*

11   *Rogers Assocs. v. Gardner-Denver Co.*, 718 F.2d 1431, 1437 (6th Cir. 1983).  Not only is the

12   allocation of costs as either fixed or variable done on a case-by-case basis, but it is distinctly a

13   question for the jury to decide under appropriate instructions. *William Inglis & Sons Baking*

14   *Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1038 (9th Cir. 1981).  This issue cannot

15   and should not be resolved on the pleadings.

16           Furthermore, prior to discovery and expert analysis, no plaintiff who did not have

17   access to a monopolist's detailed and confidential records could reasonably provide more

18   specificity than plaintiffs here already have about a critical aspect of the underlying test:  Abbott's

19   average variable costs for Kaletra.  While Plaintiffs can (and have) made an educated analysis of

20   Abbott's likely margins and cost structure based upon economic insights and publicly available

21   information (and as shown below, now essentially confirmed *by Abbott's own motion as well as*

22   *internal documents reviewed to date*), details about Abbott's average variable costs are, almost by

23   definition, within the exclusive possession and control of Abbott.  The Ninth Circuit itself

24   recognized this very fact as a feature of its holding: it allows the incumbent firm deciding whether

25   or not to engage in discount bundling to have within its own possession all of the information

26   necessary to "calculate whether its discounting practices run afoul of the [Court's] rule."

27   *Cascade*, 2008 WL 269506 at *17.  Those potentially injured by the incumbent's practices

28   generally cannot plead—at the outset of a case and prior to discovery—satisfaction of the

- 14 -

1    *Cascade* test with the kind of specificity Abbott would apparently have this Court require.

2    Plaintiffs can only do what Plaintiffs here did: conduct an analysis based upon publicly available

3    information sufficient to allege satisfaction of the test, and comply with their general pleading

4    obligations by putting Abbott on notice of the claims against it.

5            Neither *Twombly*, nor *Erickson*, nor *Cascade*, nor any other case, supports the

6    proposition that a plaintiff should be denied all remedy for facially anticompetitive behavior

7    simply because it did not do the impossible: obtain access to the defendant's confidential,

8    internal, proprietary cost data *before* filing a complaint.  Indeed, if the rule Abbott seeks to

9    impose became law, *Cascade* would effectively immunize conduct that the Ninth Circuit believed

10   was clearly harmful to competition because a plaintiff would rarely, if ever, be able to get past the

11   pleadings stage.  Of course, as discussed below, plaintiffs have now been able to obtain access to

12   some of Abbott's internal cost documents (due to the cases that were pending prior to plaintiffs'

13   action)—and those documents *confirm* plaintiffs' allegations relating to satisfaction of *Cascade*.

14           In sum, Abbott does not—and cannot—seriously argue that the complaint is so

15   "sketchy" that it cannot divine the allegations relevant to the *Cascade* analysis.  In fact, Abbott

16   knows *exactly* what Plaintiffs have alleged, and believes it can calculate *to the penny* what it

17   views as its defense to the allegations of exclusionary pricing.  (*See* Abbott Mot. at 6, allocating

18   discount of $17.14 to $18.78 price of Kaletra).  The motion should therefore be denied.

19   **II.    Plaintiffs' *Cascade* Allegations Are Not Only Plausible, But Confirmed By the**
20           **Record Reviewed to Date**

21           Faced with the manifest specificity of the complaint, Abbott tries to distract the

22   Court by inviting it set aside plaintiffs' allegations and then perform a truncated *Cascade* analysis

23   without evidence, expert analysis, and based on Abbott's proffered "assumptions" about the

24   nature of variable costs in the pharmaceutical industry.  Abbott goes on to allude to Rule 11,

25   darkly implying that plaintiffs' counsel have somehow violated their professional obligations by

26   even suggesting that Abbott has engaged in exclusionary pricing under *Cascade*.  (*See* Abbott

27   Mot. at 6, arguing that to allege that Abbott discounted below the variable cost of lopinavir would

28

PLTFS' MPA IOT DEF'S MOTION TO DISMISS
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

1   not be "consistent with [plaintiffs' counsel's] Rule 11 obligations.")[3]  Abbott in effect asks the

2   Court to treat its motion to dismiss as a motion for summary judgment.  Simply stating this

3   proposal should be enough to refute it; however, in light of Abbott's invocation of Rule 11

4   plaintiffs feel constrained to point out that Abbott's own motion papers, as well as some of its

5   own internal documents regarding Abbott's costs, confirm the plausibility of plaintiffs'

6   allegations and that Abbott's costs substantially exceed its own, proposed cost threshold.

7           Abbott, "through simple arithmetic" and the allegations in plaintiffs' complaint,

8   was able to determine one side of the exclusionary pricing formula: the imputed price of $1.64 for

9   the lopinavir component of Kaletra.  (Abbott Mot. at 6.)  In other words, Abbott has now

10  acknowledged that a rival in the boosted market with the same cost structure as Abbott—*i.e.*, that

11  is "equally efficient"—would need to be able to sell its boosted protease inhibitor, profitably, at

12  $1.64 per unit.  Put another way, if Abbott's average variable costs are greater than $1.64 per

13  unit, then Abbott is effectively selling lopinavir below its costs, and thereby gaining an unfair

14  advantage in the boosted market through its Norvir monopoly.

15          Thus, the remaining *Cascade* question is: using Abbott's price computation for

16  purposes of discussion, are Abbott's average variable costs (appropriately conceived) in excess of

17  $1.64 per unit?  Curiously, putting Abbott's rhetoric aside, while Abbott alludes to the supposed

18  implausibility of its costs being that "high," Abbott itself *says nothing about what its own costs*

19  *actually are or even whether those costs exceed $1.64 per unit*.  In other words, even though that

20  information is surely available to Abbott (and, at this point, uniquely so), Abbott's motion does

21  not even squarely contest plaintiffs' allegation that upon doing the computation provided by

22  *Cascade* ". . . the resulting price [of the boosted portion of Kaletra] would be below Abbott's

23  average variable costs relating to the Boosted-PI portion of Kaletra." (¶ 41.)

24

25  [3] The allusion to Rule 11 in a motion to dismiss (as opposed to a separately noticed motion)
    violates the Rule and is surely the last gasp of the desperate litigant.  Rule 11 "should not be
26  employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the
    pleadings; other motions are available for those purposes.... The rule provides that requests for
27  sanctions must be made as a separate motion, *i.e.*, not simply included as an additional prayer for
    relief contained in another motion."  Fed. R. Civ. Pro. 11, Advisory Committee Notes to 1993
28  Amendments, subd. (b) and (c).

1       Furthermore, Abbott's suggestion of implausibility is not only made without

2  evidence, it is founded on an entirely inaccurate and, what will be, at minimum, contested

3  premise: that the only costs relevant to the average variable cost computation for the *Cascade*

4  computation are those relating solely to the manufacturing of lopinavir. Abbott argues that

5  "under *Cascade*, [] Plaintiffs must plead at least that it costs Abbott more than $1.64 *to*

6  *manufacture* just the lopinavir portion of a Kaletra pill." (Abbott Mot. at 6, emphasis changed.)

7  Abbott provides no support for that proposition whatsoever, nor could it. As discussed below,

8  average variable costs include far more than simply manufacturing. Indeed, in the very same

9  paragraph in which Abbott advances this spurious argument, Abbott cites a case, *United States v.*

10  *Generix Drug Corp.*, 460 U.S. 453 (1983), that refers to the "research, development, *and*

11  promotional costs normally associated with the creation *and marketing* of a [brand name drug]."

12  *Id.* at 455 n.1 (emphases added). (Abbott Mot. at 6.)[4]

13       Plaintiffs can (and do) certainly plausibly allege that the set of such average

14  variable costs for Kaletra (less the average variable costs solely applicable to the ritonavir/Norvir

15  portion of Kaletra) exceed $1.64.

16

17

18

19

20

---

21  [4] In fact, average variable costs have long been defined in economics and law as those which vary with output and those which a firm would have to consider when contemplating a change in

22  output. *Inglis*, 668 F.2d at 1037. Those costs can include, in addition to manufacturing costs, "capital, executive, and administrative costs, sales expenses, and some elements of promotional

23  expense[.]" *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 133 F.R.D. 41, 43 n.2 (D. Nev. 1990). Advertising and other marketing expenses relate "directly to immediate output" and thus must be

24  part of the cost computation for *Cascade*. *See* Phillip E. Areeda & Herbert Hovenkamp, III Antitrust Law ¶ 740d2 (Little Brown & Co, rev ed. 2007) (discussing advertising and promotional

25  as variable costs); *cf. IMSX Health Inc. v. Ayotte*, 490 F. Supp. 2d 163, 167 (D.N.H. 2007) (pharmaceutical companies spend substantial amounts on promotion).

26  [5] Because Kaletra includes ritonavir/Norvir (for boosting) combined with lopinavir (Abbott's boosted drug), the relevant costs may be only those average variable costs associated with

27  Abbott's selling its boosted product into the boosted market. Accordingly, that would include all average variable costs associated with Kaletra other than those specifically attributable to

28  ritonavir/Norvir. (¶ 41.)

4   The evidence thus shows that *Cascade* is clearly satisfied, thereby bolstering plaintiffs'

5   allegations.[6]

6           In sum, plaintiffs plausibly and in good faith have alleged that Abbott has engaged

7   in exclusionary pricing under *Cascade*. This allegation is sufficient (though not legally

8   necessary), and nothing more is required at this juncture. Abbott's motion to dismiss should be

9   denied even if this Court rules that *Cascade* applies in non-discounting cases such as this one.

10  **III.    Plaintiffs Sufficiently Plead Monopolization of the Boosting Market**

11          The direct class plaintiffs further, and separately, allege that Abbott improperly

12  maintained and/or enhanced its monopoly power in the boosting market. (Complaint ¶¶ 18, 68-

13  71.) This enhanced power made Abbott's rivals in the boosted market more reliant upon Norvir

14  than they otherwise would have been, and thus furthered Abbott's scheme to leverage its

15  (enhanced) monopoly power in the boosting market to maintain and/or enhance monopoly power

16  in the boosted market.

17          Plaintiffs sufficiently allege this claim. A claim of monopolization requires proof

18  that: (1) Abbott possessed monopoly power in the boosting market, and (2) Abbott willfully

19  maintained that power. *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir.

20  1997). Plaintiffs allege, and Abbott does not contest, that it controls 100% of the boosting

21  market. (Complaint ¶¶ 18, 44.) Plaintiffs further allege Abbott improperly maintained its

22

23  [6] Put differently, Kaletra is priced at $18.78. *Id.* Dividing the $1.64 imputed price of the
    lopinavir component by Kaletra's $18.78 price yields a percentage of 8.7%. In plain English, the
24  lopinavir component of Kaletra is priced at 8.7% of Kaletra's total price. Therefore, if Abbott's
    average variable costs of Kaletra are above 8.7% of Kaletra's price, Abbott has engaged in
25  exclusionary pricing under *Cascade*. For Abbott to *not* be engaged in exclusionary pricing under
    *Cascade*, it would need to enjoy margins of 91.3% (1 – 8.7%) on its sales of Kaletra. The

1   monopoly power in the boosting market by inducing rivals to rely on Norvir through Abbott's

2   well-established course of selling Norvir at a reasonable price, and licensing for co-promotion to

3   manufacturers of boosted protease inhibitors, and then reversing course with its massive price

4   increase.  Abbott does not contest that this exact type of conduct has been held to violate Section

5   2.  *E.g., Aspen Skiing Co.*, 472 U.S. at 603 (finding a violation of Section 2 where "the

6   monopolist elected to make an important change in a pattern of distribution that had originated in

7   a competitive market and had persisted for several years"); *Kodak*, 125 F.3d at 1211.

8           Instead, Abbott's entire argument is that since Abbott has patents on Norvir, it can

9   do what it wants with Norvir.  This contention has no merit, and thus Abbott's motion to dismiss

10  this claim should be denied.

11          First, plaintiffs are *not* challenging Abbott's conduct relating to its patents on

12  Norvir.  Rather, plaintiffs are challenging misuse of monopoly power.  Just as leveraging

13  monopoly power from one market to another can violate Section 2 of the Sherman Act (regardless

14  of whether that monopoly power was obtained through patent rights or otherwise), improperly

15  wielding monopoly power within a market can also violate Section 2.  *E.g., Aspen Skiing*.  More

16  specifically, plaintiffs *are* challenging Abbott's use of its patent-protected monopoly to impede

17  the development of potential rivals for Norvir and/or technologies to reduce the amount of Norvir

18  used as a boosting agent.  Abbott abused its monopoly power in the boosting market by

19  deliberately lulling its competitors into relying on Norvir's availability at Abbott's standard price

20  and then yanking the rug out from underneath them by increasing Norvir's price by more than

21  400%.[7]

22

23  _____

24  [7] Abbott half-heartedly argues that plaintiffs' claims regarding the boosting market (where,
    according to Abbott, Norvir use was encouraged) are inconsistent with plaintiffs' claims
    regarding the boosted market (where, according to Abbott, Norvir use was discouraged).  (Abbott

25  Mot. at 2.)  Abbott's argument ignores the timing involved in each claim.  Abbott's
    anticompetitive conduct in the boosting market occurred prior to the December 3, 2003 price

26  increase as Abbott induced would-be competitors in the boosting market to rely on Norvir.
    Abbott's anticompetitive conduct in the boosted market began with the December 3, 2003 price

27  increase on Norvir and continued as Abbott leveraged its monopoly position in the boosting
    market – which was now stronger due to the conduct at issue – to impede rivals to Kaletra in the

28  boosted market.

1    Abbott cultivated this reliance by implicitly and explicitly licensing to competitors

2    the right to market boosted protease inhibitors to be co-administered with Norvir.[8]  Specifically,

3    in 2001 and 2002, Abbott approached Bristol-Myers Squibb Co., GlaxoSmithKline, and other

4    actual and potential competitors in the boosted market about procuring licenses from Abbott for

5    the right to label and market their existing boosted protease inhibitors, and any boosted protease

6    inhibitors in development, with Norvir.  Abbott successfully persuaded GlaxoSmithKline into

7    entering into a license agreement for Norvir in December 2002, which generated a substantial

8    profit for Abbott. Abbott, meanwhile, was secretly plotting to change its established course of

9    dealing by limiting Norvir's availability by either removing it from the market altogether or

10   drastically increasing its price to make it financially difficult to obtain.  Abbott did not disclose

11   these plans to GlaxoSmithKline or any other actual or potential licensees, preferring that they

12   continue to rely on Norvir as the *de facto* standard boosting agent.  As a result of Abbott's

13   scheme, would-be competitors in the boosting market, including GlaxoSmithKline, delayed

14   developing potential boosting drugs to compete with Norvir and/or protease inhibitors that

15   required a smaller dosage of Norvir.[9]  (¶¶ 15, 18, 26-33, 34-37.)

16        The disconnect between Abbott's public actions to promote and profit from the use

17   of Norvir by other manufacturers of boosted protease inhibitors and its undisclosed plan leading

18   to its announcement of eventual price increases to limit access to Norvir forms the crux of

19   Plaintiffs' Section 2 claims with respect to the boosting market.  Plaintiffs allege that Abbott

20   deceived would-be competitors into adopting Norvir as their boosting agent and then changed its

21   voluntary and profitable course of dealing for the purpose of hindering competition.  Because

22   potential competitors were delayed in developing rival boosting drugs and/or PIs that required a

23   [8] Abbott has admitted that five of its competitors have express licenses for Norvir but disputes

24   that it has impliedly granted licenses. *In re Abbott Laboratories Norvir Antitrust Litig.*, 442 F.
     Supp. 2d 800, 810-11 (N.D. Cal. 2006) (concluding that there is a dispute on summary judgment

25   as to whether Abbott has impliedly licensed Norvir).

26   [9] In October 2007, GlaxoSmithKline did receive FDA approval for Lexiva boosted with 100 mg
     of Norvir as opposed to the standard 200 mg dose of Norvir.  If Abbott had not wrongly induced

27   GlaxoSmithKline into a licensing agreement for Norvir in December 2002 and led
     GlaxoSmithKline to believe that Norvir would be available at Abbott's usual price,

28   GlaxoSmithKline would have developed and obtained FDA approval for Lexiva with 100 mg of
     Norvir significantly earlier.  (¶ 37.)

PLTFS' MPA IOT DEF'S MOTION TO DISMISS
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

1   smaller dosage of Norvir, competition was stifled in the boosting market and Plaintiffs were

2   forced to pay artificially inflated prices for Norvir.

3            Abbott seeks refuge behind the fact that it obtained patents on Norvir. This is

4   without merit. Abbott's conduct described above does *not* relate to its patents on Norvir or

5   depend on its patents on Norvir. It is thus subject to antitrust scrutiny. *United States v. Masonite*

6   *Corp.*, 316 U.S. 265, 277 (1945) ("A patent affords no immunity for a monopoly not fairly or

7   plainly within the grant."); *In re Cardizem*, 332 F.3d at 908 (noting that "it is one thing to take

8   advantage of a monopoly that naturally arises from a patent, but another thing altogether to

9   bolster the patent's effectiveness in inhibiting competitors"); *In re K-Dur Antitrust Litig.*, 338 F.

10  Supp. 2d 517, 532 (D.N.J. 2004) (denying defendants' motion to dismiss where plaintiffs' claims

11  involved conduct "in excess of those rights granted by the patent"); *In re Ciprofloxacin*

12  *Hydrochloride Antitrust Litig.*, 166 F. Supp. 2d 740, 749 (E.D.N.Y. 2001) ("[I]t cannot be stated

13  that the patent 'exception' swallows the prohibitions against monopolies and trusts as a whole;

14  even the holder of a valid patent may be subject to liability for conduct amounting to an

15  unreasonable restraint of trade."). Abbott concedes this is the prevailing law. (Abbott Mot. at 7.)

16  In fact, Abbott is no stranger to antitrust liability for anticompetitive conduct outside the grant of

17  its patents. *See In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1319 (S.D.

18  Fla. 2005) (holding that Abbott's conduct "exceeded the scope of the protections afforded Abbott

19  under the '207 patent . . ." and constituted a *per se* violation of the Sherman Act).

20           Plaintiffs allege that Abbott engaged in a pattern of inducing would-be competitors

21  to rely on Norvir while internally planning to either remove Norvir from the market or

22  substantially increase its price, thereby harming rivals in the boosted market reliant upon Norvir,

23  and improperly advantaging Kaletra. That conduct has nothing to do with Abbott's patent rights,

24  and everything to do with misuse of monopoly power. Abbott's effort to dismiss Plaintiffs'

25  claims regarding the boosting market by distorting the allegations and hiding behind its patent

26  must be rejected.

27

28

## CONCLUSION

For the foregoing reasons and those set out in the Plaintiffs' Joint Opposition to the Omnibus Motion, Abbott's motion should be denied.

DATED: February 14, 2008         LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By: _Joseph Saveri_ / by permission B.G.

    Joseph R. Saveri

Joseph R. Saveri
*jsaveri@lchb.com*
Eric B. Fastiff
*efastiff@lchb.com*
Brendan Glackin
*bglackin@lchb.com*
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone:    (415) 956-1000
Facsimile:    (415) 956-1008

*Attorneys for Individual and Representative Plaintiff*
*Rochester Drug Co-Operative, Inc.*

SPIEGEL, LIAO & KAGAY
Charles M. Kagay (State Bar No. 73377)
*cmk@slksf.com*
Wayne M. Liao (State Bar No. 66591)
*wml@slksf.com*
388 Market Street, Suite 900
San Francisco, California 94111
Telephone:    (415) 956-5959
Facsimile:    (415) 962-1431

*Attorneys for Individual and Representative Plaintiff*
*Louisiana Wholesale Drug Company, Inc.*

PLTFS' MPA IOT DEF'S MOTION TO DISMISS
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

1 KAPLAN FOX & KILSHEIMER LLP
2 Laurence D. King (SBN 206423)
  *lking@kaplanfox.com*
3 Linda M. Fong (SBN 124232)
  *lfong@kaplanfox.com*
4 350 Sansome Street, Suite 400
  San Francisco, CA 94104
5 Telephone: (415) 772-4700
  Facsimile: (415) 772-4707

6
  Robert N. Kaplan (*Pro Hac Vice*)
7 *rkaplan@kaplanfox.com*
  Linda P. Nussbaum (*Pro Hac Vice*)
8 *lnussbaum@kaplanfox.com*
  John D. Radice (*Pro Hoc Vice*)
9 *jradice@kaplanfox.com*
  850 Third Avenue, 14th Floor
10 New York, NY 10022
  Telephone: (212) 687-1980
11 Facsimile: (212) 687-7714

12 *Lead Counsel for Meijer, Inc. and Meijer Distribution, Inc.*

13
  BERGER & MONTAGUE, P.C.
14 Daniel Berger
  *danberger@bm.net*
15 Eric L. Cramer (*Pro Hac Vice*)
  *ecramer@bm.net*
16 David F. Sorensen
  *dsorensen@bm.net*
17 1622 Locust Street
  Philadelphia, PA 19103
18 Telephone: (215) 875-3000
  Facsimile: (215) 875-4604

19
  *Lead Counsel for Rochester Drug Cooperative, Inc.*
20

21 GARWIN GERSTEIN & FISHER, LLP
  Bruce E. Gerstein (*Pro Hac Vice*)
22 *bgerstein@garwingerstein.com*
  Noah H. Silverman (*Pro Hac Vice*)
23 *nsilverman@garwingerstein.com*
  1501 Broadway, Suite 1416
24 New York, New York 10036
  Tel: (212) 398-0055
25 Fax: (212) 764-6620

26 *Lead Counsel for Louisiana Wholesale Drug Co., Inc.*

27

28

PLTFS' MPA IOT DEF'S MOTION TO DISMISS
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

1    ODOM & DES ROCHES, LLP
     John Gregory Odom (*Pro Hac Vice*)
2    *dodom@odrlaw.com*
     Stuart E. Des Roches (*Pro Hac Vice*)
3    *stuart@odrlaw.com*
     John Alden Meade (*Pro Hac Vice*)
4    *jmeade@odrlaw.com*
     Suite 2020, Poydras Center
5    650 Poydras Street
     New Orleans, LA 70130
6    Tel: (504) 522-0077
     Fax: (504) 522-0078
7
     PERCY SMITH & FOOTE, LLP
8    David P. Smith (*Pro Hac Vice*)
     *dpsmith@psfllp.com*
9    W. Ross Foote (*Pro Hac Vice*)
     *rfoote@psfllp.com*
10   720 Murray Street
     P.O. Box 1632
11   Alexandria, LA 71309
     Tel: (318) 445-4480
12   Fax: (318) 487-1741

13   KOZYAK TROPIN & THROCKMORTON
     Tucker Ronzetti (*Pro Hac Vice*)
14   *tr@kttlaw.com*
     Adam Moskowitz (*Pro Hac Vice*)
15   *amm@kttlaw.com*
     2800 Wachovia Financial Center
16   200 South Biscayne Boulevard
     Miami, Florida 33131-2335
17   Telephone: (305) 372-1800
     Telecopier: (305) 372-3508
18
     AUBERTINE DRAPER ROSE, LLP
19   Andrew E. Aubertine (*Pro Hac Vice*)
     *aa@adr-portland.com*
20   1211 SW Sixth Avenue
     Portland, Oregon 97204
21   Telephone:    (503) 221-4570
     Facsimile:    (503) 221-4590
22
     LAW OFFICES OF JOSHUA P. DAVIS
23   Joshua P. Davis (State Bar No. 193254)
     *davisj@usfca.edu*
24   437A Valley Street
     San Francisco, CA 94131
25   Telephone:    (415) 422-6223

26

27

28