# TAB A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

)
IN RE K-DUR ANTITRUST LITIGATION            )
                                            )          Civil Action No. 01-1652 (JAG)
                                            )              (Consolidated Cases)
This Document Relates To:                   )
                                            )
All Actions                                 )          MDL Docket No. 1419
                                            )
                                            )

## SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING
## THE APPEAL OF MAGISTRATE JUDGE G. DONALD HANEKE'S DISCOVERY
## ORDER OF MARCH 24, 2005 FILED BY DEFENDANTS, SCHERING-PLOUGH
## CORPORATION AND UPSHER-SMITH LABORATORIES, INC.,
## AND THE CROSS-APPEAL FILED BY THE DIRECT PURCHASER PLAINTIFFS

ORLOFSKY, SPECIAL MASTER

### I.     INTRODUCTION

This consolidated antitrust action has been transferred to the District of New Jersey by

the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407. Pursuant to Rule 53

of the Federal Rules of Civil Procedure[1] and by consent of all parties in the above-captioned

action, I have been appointed by Order of this Court, dated April 12, 2006, to preside as a

Special Master to review and decide all currently pending and future motions directed to Judge

---

[1](a) **Appointment.**

. **(1)** Unless a statute provides otherwise, a court may appoint a master only to:
   (A)  perform duties consented to by the parties;

*  *  *

(C)  address pretrial and post-trial matters that cannot be addressed effectively and timely by an available
district judge or magistrate judge of the district.

Joseph A. Greenaway, Jr. and Magistrate Judge Madeline Cox Arleo including, but not limited

to, discovery disputes, class certification and summary judgment (the "Appointment Order")

(Docket No. 316). The Appointment Order provides that the decision of the Special Master on

any matter before the Special Master will conclusively resolve that matter unless an appropriate

objection is filed pursuant to Fed. R. Civ. P. 53(g).

Initially, there were a total of thirteen (13) motions that were filed and referred to me for

resolution. This Report and Recommendation will decide the third (3rd) of the motions

originally referred to me – the Notice of Appeal of Magistrate Judge G. Donald Haneke's

Discovery Order of March 24, 2005, filed by Defendants, Schering-Plough Corporation

("Schering") and Upsher-Smith Laboratories, Inc., ("Upsher") on April 11, 2005 ("the Appeal"),

and the Cross-Appeal filed by the Direct Purchaser Plaintiffs on April 21, 2005 ("the Cross-

Appeal").[2]

Notwithstanding the Appointment Order, there was a question raised as to whether I had

jurisdiction under the Appointment Order to decide the Appeal and the Cross-Appeal of

Magistrate Judge Haneke's Discovery Order of March 24, 2005. Because of the question

regarding the scope of my jurisdiction, on August 3, 2006, I wrote to Magistrate Judge Madeline

Cox Arleo seeking guidance from her or Judge Greenaway on the jurisdictional question

presented. On September 8, 2006, Judge Greenaway entered a Letter Order confirming that my

jurisdiction was sufficiently broad to include both the Appeal and the Cross-Appeal. The Letter

Order provides:

> "The April 17, 2006 Appointment Order specifically provides that
> Special Master Orlofsky 'shall have responsibility to decide in the
> first instance all current and pending future motions in the above-
> captioned matter that would otherwise be directed to Judge

---

[2] The motions are numbered in chronological order based on the date when each of the respective motions was filed.

> Greenaway or to the Magistrate Judge....' Thus, all currently
> pending motions, including the appeal from Judge Haneke to me
> shall be decided by Special Master Orlofsky in the first instance."

Following Judge Greenaway's Letter Order, because of the passage of time since the
Appeal and Cross-Appeal were filed, I invited all parties to file supplemental letter briefs
regarding the current status of the law regarding the issues on appeal. Thereafter, on October 16,
2006, I heard oral argument on the Appeal and Cross-Appeal.

## II.    FACTUAL BACKGROUND

The factual background of this consolidated action and the underlying motions has been
set forth in detail in Judge Greenaway's decision in this case, *see In re K-Dur Antitrust Litig.*,
338 F.Supp.2d 517 (D.N.J. 2004), and my Report and Recommendation on:  (1) Defendants
Schering-Plough Corporation, Key Pharmaceuticals, Inc. and Upsher-Smith Laboratories, Inc.'s
Motion for Sanctions against Plaintiff Commonwealth of Pennsylvania; (2) Plaintiff
Commonwealth of Pennsylvania's Cross-Motion to Dismiss; and (3) Motion of James Morgan to
Intervene as Class Representative (Docket No. 328).  Familiarity with the factual background
and procedural history of this case is presumed and will not be repeated in this Report and
Recommendation, except where necessary to resolve the Appeal and Cross-Appeal.

On February 7, 2005, Magistrate Judge Haneke heard oral argument on several then
pending discovery motions.  Among those motions were Schering's various letter motions
seeking downstream discovery of sales, selling prices, and profits of the direct purchaser
plaintiffs.  At the oral argument, because of the numerous issues presented for resolution,
Magistrate Judge Haneke characterized Schering's motion seeking downstream discovery as
dispute number one:

> But I identified, and just because I -- it's the first one I got to,
> dispute number one, which has multiple letters, starting in the
> middle of October and continuing for quite some time, that

3

> basically has to do with an argument about the discovery having to
> do with downstream sales and profit information, a lot of letters
> going back and forth on that."

February 7, 2005 Hearing Tr. at 5-6.

Following extensive oral argument on all of the then pending motions, Magistrate Judge

Haneke denied Schering's motion seeking downstream discovery from the bench. As the basis

for his ruling, Magistrate Judge Haneke simply stated that he was denying the motions based

upon the arguments advanced by the plaintiffs:

> Okay. As to the two disputes that I've identified under my -- we'll
> work as numbers one and two, the discovery requests are denied
> for the reasons articulated by the plaintiffs.

Id. at 43.

Thereafter, on March 24, 2005, Magistrate Judge Haneke entered an Order denying

Schering's discovery motions as follows:

> Schering-Plough's letter motions dated September 23, 2004;
> October 15, 2004; October 28, 2004 seeking certain document and
> interrogatory discovery including "downstream discovery" of
> sales, selling prices, and profits of direct purchaser plaintiffs, and
> of AmerisourceBergen Corporation, McKesson Corporation and
> Cardinal Health, Inc. are DENIED.

March 24, 2005 Order of Magistrate Judge Haneke.

## III.    THE PARTIES' FILINGS

The parties have filed comprehensive briefs addressing the Appeal and the Cross-Appeal.

The filings began with the initial Notice of Appeal filed by the Defendants on April 1, 2005 and

continued until October 9, 2006, when the supplemental letter briefing by the parties was

completed, following the assignment of this matter to me. In deciding the Appeal and Cross-

Appeal, I have considered the following filings made by the parties:

- 4/1/2005 Notice of Appeal of Defendants; Memorandum of Law in Support;
  Declaration of William O'Shaughnessy with Exhibits 1-41.

4

- 4/11/2005 Indirect Purchaser Plaintiffs' Memorandum of Law In Opposition to Defendant's Appeal.

- 4/21/2005 Direct Purchaser Class Plaintiff Louisiana Wholesale Drug Company, Inc.'s Memorandum of Law in Opposition to Defendants' Appeal; Certification of Rebekah Conroy with Exhibits 1-17.

- 4/21/2005 Opt-Out Pharmacy Plaintiffs' Brief in Opposition to Defendants' Appeal with Exhibits A-B.

- 4/21/2005 Absent Putative Class Member AmerisourceBergen Corporation's Memorandum of Law in Opposition to Defendants' Appeal with Exhibits A-B.

- 4/21/2005 Absent Putative Class Member Cardinal Health, Inc.'s Reply to Defendants' Appeal with Exhibits A-C.

- 4/21/2005 McKesson Corporation's Memorandum of Law in Opposition to Defendants' Appeal.

- 4/21/2005 Direct Purchaser Plaintiffs' Notice of Cross-Appeal of Magistrate Judge G. Donald Haneke's Discovery Order of March 24, 2005; Memorandum of Law in Support; Certification of Rebekah Conroy with Exhibits 1-2.

- 5/2/2005 Defendants' Reply Memorandum in Support of Their Appeal; Declaration of William O'Shaughnessy with Exhibits 1-2.

- 5/2/2005 Defendants' Memorandum of Law in Opposition to Direct Purchaser Plaintiffs' Cross-Appeal; Declaration of William O'Shaughnessy with Exhibit 1.

- 6/21/2005 Schering's Supplemental Reply Memorandum in Support of the Appeal; Declaration of William O'Shaughnessy with Exhibit A.

- 8/16/2005 Absent Putative Class Member Cardinal Health, Inc.'s Response to Schering's Supplemental Reply Memorandum in Support of the Appeal.

- 10/28/2005 Letter from Barry Taus to Judge Joseph Greenaway on behalf of Direct Purchaser Class Plaintiff, Louisiana Wholesale Drug Company, Inc., attaching Letter Opinion and Order in Louisiana Wholesale Drug, Co. v. Becton Dickinson.

- 11/1/2005 Letter from Alan Wiseman on behalf of Defendants to Judge Joseph Greenaway in Response to letter from Barry Taus dated October 28, 2005.

- 11/18/2005 Letter from Barry Taus to Judge Joseph Greenaway on behalf of Direct Purchaser Class Plaintiff, Louisiana Wholesale Drug Company, Inc., in response to letter of Alan Wiseman dated November 1, 2005.

- 10/4/2006 Letter from Alan Wiseman to Stephen M. Orlofsky on behalf of Defendants.

- 10/4/2006 Letter from Peter Pearlman to Stephen M. Orlofsky on behalf of Direct Purchaser Class Plaintiff, Louisiana Wholesale Drug Company, Inc., with Exhibits 1-8.

- 10/4/2006 Letter from Barry Refsin to Stephen M. Orlofsky on behalf of Opt-Out Pharmacy Plaintiffs with Exhibit A.

- 10/4/2006 Letter from Steven Bizar to Stephen M. Orlofsky on behalf of Absent Putative Class Member AmerisourceBergen Corporation.

- 10/9/2006 Letter from Alan Weisman to Stephen M. Orlofsky on behalf of Defendants with Exhibits 1-6.

- 10/9/2006 Letter from Peter Pearlman to Stephen M. Orlofsky on behalf of Direct Purchaser Class Plaintiff Louisiana Wholesale Drug Company, Inc., with Exhibit A.

- 10/9/2006 Letter from Steven Bizar to Stephen M. Orlofsky on behalf of Absent Putative Class Member AmerisourceBergen Corporation.

- 10/9/2006 Letter from Thomas Long to Stephen M. Orlofsky on behalf of Absent Putative Class Member Cardinal Health, Inc.

The positions of the parties as set forth in their filings are summarized below. Because of the voluminous submissions made by the parties, rather than summarizing each party's position, I will address the arguments presented as follows: (A) the arguments of Schering and Upsher in support of the Appeal; (B) the arguments of all of the various plaintiffs groups collectively in opposition to the Appeal; (C) the arguments of the Direct Purchaser Plaintiffs in support of the Cross-Appeal; and (D) the arguments of Schering and Upsher in opposition to the Cross-Appeal.

## A.    Schering's and Upsher's Arguments in Support of the Appeal

In their appeal from Magistrate Judge Haneke's March 24, 2005 Order, Schering and Upsher ("the Defendants") first contend that they are entitled to discovery regarding the economics of the Direct Purchasers' purchases of K-Dur and its generics, including discovery regarding the sales data, prices and profits. This discovery is commonly referred to as

6

"downstream" discovery because it concerns information regarding the purchase and sale of K-Dur and its generics, and the profits realized therefrom, after the initial purchase from Schering. Second, the Defendants also seek discovery regarding the relevant product market in this case and whether that market includes other potassium chloride products in addition to K-Dur and its AB-rated generic equivalents. Third, the Defendants initially sought discovery regarding the extent to which the insurer plaintiffs recoup the higher costs of branded K-Dur through higher premiums. The Defendants refer to this as "pass-through" discovery and contend that it is relevant on the basis of the indirect purchasers' unjust enrichment claim. However, in a subsequent submission, the Defendants stated that the indirect purchasers have agreed to produce these documents, thus mooting that portion of the Appeal.[3] Fourth, the Defendants seek additional discovery from the named consumer plaintiffs' regarding their history of switching from branded to generic drugs.

Based upon the parties' written submissions and the arguments presented at the oral argument on October 16, 2006, it is clear that the principal issue presented by this appeal is whether the Defendants are entitled to take downstream discovery. The Defendants contend that downstream discovery is necessary and relevant on several independent grounds and rely heavily on Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181 (11th Cir. 2003). First, the Defendants argue that because a class representative cannot adequately represent the interest of the class if there exists a substantial conflict of interest among class members, downstream discovery is necessary to determine whether all members of the putative class were actually harmed by the delay of generic entry.[4] Second, the Defendants seek downstream discovery to

---

[3] See the Defendants' October 4, 2006 Letter Brief.

[4] The Defendants contend that generic entry may actually harm some wholesalers because of the following: (1) the volume of sales may decrease when retail customers begin purchasing generics directly from the

062038.00617/21542604v.3

determine whether generic and branded versions of K-Dur are economically equivalent which, they argue, is necessary to determine whether the overcharge measure of damages based upon price differences is the correct measure of damages. Third, the Defendants argue that downstream discovery is relevant to the indirect purchasers' claims in terms of both class certification and quantification of damages. Specifically, the Defendants seek the discovery to determine the extent of the savings associated with generic sales that were passed-on to indirect purchasers by LWD. Also, the Defendants contend that the discovery is necessary to allocate damages among the indirect purchasers pursuant to equitable remedies such as unjust enrichment. Fourth, the Defendants argue that downstream discovery is necessary to determine whether the contracts between direct purchasers and indirect purchasers were "cost-plus" contracts which are excepted from the pass-on defense established by Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481 (1968).[5] The Defendants also argue that the three national wholesalers (AmerisourceBergen Corp. ("ABC"), Cardinal Health, Inc. ("Cardinal") and McKesson Corp. ("McKesson") (collectively "the National Wholesalers")) are not mere absent class members and should be subject to downstream discovery.

Turning to the specific arguments that the Defendants contend support their right to conduct downstream discovery, notwithstanding the limited relevance of such discovery in the context of Hanover Shoe, they first argue that they are entitled to downstream discovery to test

---

manufacturer; (2) wholesalers are not allowed the same opportunities to purchase generic drugs in advance of price increases; (3) because the price differences between larger and smaller bottles of generic drugs generally are insufficient to allow wholesalers to purchase larger, cheaper sizes and repackage them into smaller, higher-priced bottles sizes; and (4) sales pursuant to contracts which provide for a percentage profit margin yield less per unit profit when generic prices are lower.

[5] The Defendants cite a November 23, 2004 letter from Barry Refsin to Magistrate Judge Haneke for the proposition that the Opt-Outs admit that they could sue under the cost-plus exception of Illinois Brick. However, that letter merely states that if the Defendants' position regarding the existence of cost-plus contracts were true (which the Opt-Outs and the National Wholesalers continue to dispute) then the Opt-Outs could sue under the cost-plus exception.

8

whether this is actually a case involving an overcharge. The Defendants contend that the damages sought by the direct purchasers are not an overcharge because branded drugs such as K-Dur are not the same product as generics from an economic analysis standpoint. The Defendants also argue that the plaintiffs are simply referring to their damage claims as "overcharges" and dispute whether the branded versus generic price differential is actually an overcharge. The Defendants also distinguish cases cited by the plaintiffs involving the denial of downstream discovery which involved price-fixing allegations. The Defendants attempt to distinguish those cases on the ground that the plaintiffs here admit that their claims do not involve price fixing. Importantly, the Defendants argue, price fixing involves the same product whose price has been artificially inflated. The Defendants then conclude by distinguishing the cases cited by LWD arguing that in each of those cases, the products at issue did not have the different economic characteristics of a branded drug and its generic equivalent.

The Defendants also dispute the arguments of LWD that Valley Drug was wrongly decided by the Eleventh Circuit and should not be followed in the Third Circuit. The Defendants begin by stating that there is clear precedent in the Third Circuit for denying class certification on the basis of intra-class conflicts. Georgine v. Amchem Products, Inc., 83 F.3d 610, 630 (3d Cir. 1996), aff'd, Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997). Defendants also cite Bradburn Parent/Teacher Store, Inc. v. 3M, Civ. Action No. 02-7676, 2004 U.S. Dist. LEXIS 16193, at *28 (E.D. Pa. Aug. 17, 2004) for the proposition that if there were members of a proposed class that benefited from the alleged anti-competitive behavior, class certification may be inappropriate.[6] The Defendants also urge that the prior approval of the settlement with Wyeth in this case by Judge Greenaway should not been seen as a rejection of Valley Drug because the

---

[6] However, I note that in Bradburn the Court stated that "Plaintiff contends that every member of the proposed class paid too much for 3M branded tape...." Id. (emphasis in original).

settlement was approved without the benefit of discovery, expert reports or a contested proceeding.[7] Finally, the Defendants urge that I reject LWD's argument that there could never be a conflict given the fact that generic entry has already occurred and damages have already been established.

Next, the Defendants argue that downstream discovery from the direct purchaser plaintiffs ("the Directs") is relevant to the claims of the Indirect Purchaser Plaintiffs ("the Indirects"). The Defendants argue that the Indirects are entitled to seek only the portion of the overcharge that was passed on to them. Therefore, the Defendants argue, they should be entitled to downstream discovery from the Directs regarding sales from them to the Indirects so that they may determine the scope of the pass-on damages. The Defendants also argue that class certification may be denied if the downstream discovery requested reflects that various Indirects were affected differently due to inconsistent pass-on behavior by intermediaries in the distribution chain. These differences may raise individualized injury and damages claims within the indirect purchaser class. The Defendants then cite fourteen cases in which they argue that courts have denied class certification of an indirect purchaser class. Finally, the Defendants also argue that data from IMS Health, despite the plaintiffs' arguments to the contrary, is insufficient to address the issue of pass-on damages between the Directs and the Indirects.

The Defendants' further contend that they are entitled to discovery regarding market definition despite LWD's argument that it will rely upon direct evidence of anticompetitive effects arising from the relevant agreements. The Defendants further state that LWD failed to

---

[7] LWD has argued that the prior approval of the settlement involving Wyeth without the benefit of downstream discovery was a ruling from this Court that downstream discovery was unnecessary and irrelevant. I decline to hold that Judge Greenaway's approval of the Wyeth settlement definitively determined the issue of the relevance of downstream discovery in this case.

respond to case authority cited by them in direct opposition to LWD's position that market definition discovery was not needed.

Finally, the Defendants argue that they are entitled to discovery regarding the consumer plaintiffs' history of switching from branded to generic drugs despite the consumer plaintiffs' objection that such requests intrude on the plaintiffs' past medical history.

**B.    The Plaintiffs' Responses in Opposition to the Appeal**

LWD, on behalf of the Directs, argues that downstream discovery is legally irrelevant and improper. LWD begins by stating that this case is brought under the federal antitrust laws to recover for overcharges. As such, as a direct purchaser, and if successful on its claims, LWD is entitled to recover the full amount of the overcharge only and that the downstream effects of the overcharge is irrelevant as a matter of law under controlling Supreme Court precedent. LWD contends that the Supreme Court's decision in Hanover Shoe and subsequent cases have made clear that in an antitrust overcharge case, the scope of the permissible damages and, concomitantly, the scope of permissible discovery, is limited solely to the amount of the overcharge – lost profits. Therefore, any other measure of damages, as well as the related discovery is irrelevant.

In addition to arguing that downstream discovery is irrelevant under Hanover Shoe, LWD also attempts to refute the Defendants' additional arguments that downstream discovery is necessary and proper for any number of other reasons based upon Valley Drug. First, LWD argues that the Defendants' argument that downstream discovery is necessary to ensure that there are no conflicts in the putative class should be rejected. LWD argues that Defendants are not attempting to protect the interests of absent class members, but rather, they are attempting to defeat the claims of all members of the putative class. Also, LWD contends that all direct purchasers, including the National Wholesalers, may recover the full amount of the alleged

11

illegal overcharges regardless of any alleged "net" benefit they may have obtained from delayed generic entry. Moreover, the three National Wholesalers have submitted affidavits expressly stating that their interests are aligned with LWD in pursuing overcharges and that LWD can adequately represent their interests in this litigation. LWD also argues that because generic entry has now occurred, there can be no conflict because all members of the putative class are entitled to the same damages – the amount of the overcharges from the time of the alleged antitrust violations until the date of actual generic entry.

Second, LWD contends that it is entitled to seek as damages the difference in price between branded and generic K-Dur regardless of whether the direct purchasers' profits were affected. LWD contends that the Defendants' argument that downstream discovery is necessary to determine whether branded drugs were economically more valuable than generics to some of the direct purchasers is just another attempt to circumvent the reasoning of Hanover Shoe that limits the scope of discovery in antitrust cases to claims for overcharges.

Third, LWD urges that I reject the Defendants' argument that although downstream discovery may not be relevant to LWD's claims as a direct purchaser, it is necessary to evaluate the extent of the overcharge that was passed onto the Indirects. LWD argues that because there are intermediaries between itself and the Indirects, the information sought by the Defendants, even if relevant, cannot be obtained from it. Rather, LWD claims that that information is available from IMS Health, a recognized source of pricing data in the pharmaceutical industry.

Fourth, LWD submits that the Defendants' attempt to obtain downstream discovery by arguing that the National Wholesalers' contracts fall within the "cost-plus" exception of Hanover Shoe should be rejected. In addition to arguing that the cost-plus exception argument was not made to Magistrate Judge Haneke and should not be considered in this Appeal, LWD also argues

that the contracts at issue do not fit within the narrow exception discussed in <u>Hanover Shoe</u>. LWD contends that the essential elements of the cost-plus exception of fixed quantity, fixed price and pre-existing contract are absent in this case based upon deposition testimony and the language of the contracts themselves. Finally, LWD argues that opening up discovery to determine whether the contracts at issue meet the cost-plus exception would reintroduce the complications that the Supreme Court in <u>Hanover Shoe</u> directed federal courts to avoid.

Finally, LWD urges that I reject the Defendants' efforts to obtain discovery regarding potassium chloride products other than K-Dur and its generic equivalents. LWD argues that the Defendants' attempts to obtain discovery regarding these other potassium chloride products on the basis of relevant market issues should be rejected. LWD argues that it need not establish the relevant market on the basis of an elaborate market analysis involving all potassium chloride products, but rather, it may rely upon the direct, actual anticompetitive effects in the nature of the price reduction in K-Dur following generic entry. Finally, LWD argues that the data sought by the Defendants here, again, is available from IMS Health.

In their opposition to the Appeal, the Indirects address the portions of Magistrate Judge Haneke's decision regarding the Defendants' request for market definition discovery. The Indirects argue that the discovery requests regarding market definition are too burdensome and too unwieldy because the requests seek discovery of all products that claim potassium chloride as an active ingredient. As a compromise, the Indirects have offered to produce information regarding the top ten selling potassium chloride products. Moreover, the Indirects contend that the Defendants have access to all information from which they can define the potassium chloride marketplace. Finally, the Indirects object to the production of their private medical information, such as prescription drug purchases.

13

062038.00617/21542604v.3

In addition to the arguments asserted by LWD regarding the relevancy of the requested downstream discovery, the Opt-Out Pharmacy Plaintiffs[8] ("the Opt-Outs") specifically assert that the downstream discovery would include the unduly burdensome production of hundreds of thousands of transactions involving individual consumers. As for the Defendants' arguments that downstream discovery is necessary to explore whether there are conflicts among the putative class members, in addition to agreeing with LWD that downstream discovery is not necessary to determine whether there is a conflict among the putative class, the Opt-Outs argue that discovery from them – parties that have opted-out of the putative class – cannot be used to evaluate whether there is a conflict among members of the putative class. The Opt-Outs also deny that they have contended that their contracts with the National Wholesalers constitute cost-plus contracts. Finally, as for the portion of the Defendants' Appeal seeking discovery of additional potassium chloride products to define the relevant market, the Opt-Outs contend that they have provided all documents that refer to K-Dur and any other potassium chloride product. Moreover, they contend that the information sought by the Defendants is available from IMS Health.

National Wholesaler, ABC, joined in the opposition filed by LWD and makes three additional points.[9] First, ABC contends that because it is an absent member of the putative class, it is not subject to discovery as though it were a named party. Second, despite its purported status as an absent class member, ABC states that it has already voluntarily produced to the Defendants data regarding its purchases of K-Dur and its generic equivalents and the assignment of its claims regarding those products and that additional discovery would constitute an undue

---

[8] The Opt-Outs include Walgreen Co., Rite-Aid Corp., CVS Corporation, Eckerd Corporation, Albertson's Inc., The Kroger Co., Safeway, Inc., and Hy-Vee, Inc.

[9] The other national Wholesalers also have filed briefs in opposition to the Defendants' Appeal which argue, in essence, the same points advanced by ABC.

14

burden. Third, ABC contends that the Defendants' argument that they are seeking downstream discovery to protect ABC's own interest because of the potential of a conflict between ABC and LWD as class representative should be rejected. ABC argues that it has submitted an affidavit stating that it has no objection to the action proceeding as a class action and that LWD can adequately represent its interest in the class action. The other National Wholesalers also have submitted similar affidavits.

## C.    Direct Purchaser Plaintiffs' Cross-Appeal

The Direct Purchaser Plaintiffs ("Directs") filed a Cross-Appeal of Magistrate Judge Haneke's March 24, 2005 Order regarding the denial of discovery concerning expenditures made by Schering in the research and development costs of K-Dur 20 and other drugs as well as the denial of discovery of the expert reports previously produced to the Federal Trade Commission ("FTC") by the Defendants in prior litigation. The Directs contend that until the Defendants disclaim reliance on alleged research and development costs as a defense in this matter, they should be permitted to conduct discovery of the Defendants' actual drug development costs. As for the expert reports, the Directs contend that because the reports are not privileged, and because they are relevant to the litigation, they should be produced.

In arguing that Magistrate Judge Haneke's decision denying discovery of the Defendants' research and development costs should be overturned, the Directs assert that they have a right to test the Defendants' affirmative defenses that a finding of liability in this case may discourage drug companies from investing money in research and development in the future. Although Schering has offered to produced copies of its public filings which contain information regarding its research and development expenditures, the Directs state that the public filings do not provide sufficient detail to evaluate whether the expenditures are correct, or whether they are inflated by the inclusion of expenses not appropriately charged to research and development.

15

As for the production of the Defendants' expert reports previously produced to the FTC,

the Directs contend that the Defendants do not claim that the expert reports are privileged in any

way, nor do the Defendants claim that their production would be too burdensome. The Directs

point out that earlier in the case, a request for production of these reports was denied as

premature. However, they now contend that production is warranted. They argue that there is

nothing in the Federal Rules of Civil Procedure which protect these reports from production.

They also assert that the reports are not from consulting experts which generally are not subject

to discovery, but rather, are reports that were previously disclosed to the FTC.

**D.    Defendants' Response In Opposition to the Direct Purchaser Plaintiffs' Cross-Appeal**

In response to the Direct's Cross-Appeal seeking the production of the Defendants'

research and development costs, the Defendants argue that the Directs have failed to advance any

reason for reversing Magistrate Judge Haneke's decision. Defendants agree that they have

asserted as an affirmative defense the argument that the plaintiffs' claim should be rejected

because a verdict against the Defendants could potentially impact the development of future

pharmaceuticals because of the increased costs and patent enforcement. However, the

Defendants contend that they have offered to produce copies of their annual reports filed with the

Securities and Exchange Commission ("SEC") detailing the expenditures on an annual basis for

research and development. Defendants also argue that to otherwise respond to the discovery

requests would require them to review documents created almost 20 years ago and that to do so

would be unduly burdensome and unwarranted merely because plaintiffs' counsel question the

validity of their public filings. Therefore, the Defendants argue that Magistrate Judge Haneke's

decision that the burden of discovery outweighed any possible benefit to the plaintiffs should not

be reversed.

16

Defendants also contend that I should not reverse Magistrate Judge Haneke's decision that the production of expert reports produced by the Defendants to the Government in the FTC action should not be produced at this time. The Defendants argue that when Magistrate Judge Haneke ruled on this issue, he ruled that the production of the expert reports was premature until such time as the Defendants identified their experts in this case. Defendants also state that they have fully complied with the Court's orders regarding the production of documents and evidence from the FTC action. However, they contend that the production of these expert reports is not warranted because those reports were not introduced in evidence in the FTC matter.

## IV.    DISCUSSION

### A.    THE STANDARD OF REVIEW

At oral argument, all of the parties agreed that I am to decide the Appeal and Cross-Appeal as if I were sitting as a District Court Judge. Tr. from Oct. 16, 2006 Oral Argument at 12-13. Therefore, the standard of review is governed by Rule 72(a) of the Federal Rules of Civil Procedure which provides that a decision of a Magistrate Judge on a non-dispositive matter can be modified or set aside only if the decision is found to be "clearly erroneous or contrary to law."[10]

"A magistrate judge's order is clearly erroneous only when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Cataldo v. Moses, 361 F.Supp.2d 420, 424 (D.N.J. 2004) quoting Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co. of Wis., 131 F.R.D. 63, 65 (D.N.J. 1990) (internal quotations omitted). The reviewing court is not permitted to receive further evidence not before the Magistrate Judge. Haines v. Liggett Group, Inc., 975 F.2d 81, 91 (3d Cir. 1992). Moreover, for a Magistrate Judge's decision to be deemed contrary to law, the

17

decision must have "misinterpreted or misapplied applicable law." Gunter v. Ridgewood Energy

Corp., 32 F.Supp.2d 162, 164 (D.N.J. 1998). However, a Magistrate Judge's legal conclusions

on a non-dispositive motion are to be reviewed de novo. Haines, 975 F.2d at 91. Finally, the

party appealing from the Magistrate Judge's decision "bears the burden of demonstrating that the

magistrate judge's decision was clearly erroneous or contrary to law." Cardona v. Gen. Motors

Corp., 942 F.Supp. 968, 971 (D.N.J. 1996). Because the Appeal and Cross-Appeal implicate

issues within Magistrate Judge Haneke's discretion, as well as some of law, I will apply the

clearly erroneous and de novo standards of review where appropriate.

## B. The Defendants' Appeal of the Denial of Downstream Discovery

The Defendants contend that they are entitled to downstream discovery regarding the

Directs' sales of K-Dur and its generics and the resulting profit margins earned on those

products. The Defendants contend that downstream discovery is relevant for at least four

reasons: (1) to explore conflicts within the putative Direct Purchaser class which could impact

class certification; (2) to explore whether the Indirects suffered individualized injury and

damages which could preclude class certification; (3) to determine how the value of branded K-

Dur should be evaluated to determine damages because this case involves two products that are

economically different (i.e. branded versus generic K-Dur), a circumstance which is

distinguishable from price-fixing cases; and (4) to explore whether the National Wholesalers sold

K-Dur pursuant to "cost-plus" contracts which, the Defendants' argue, would remove this case

from the preclusive effects of Illinois Brick, 431 U.S. 720 (1977). The Defendants also contend

---

[10] See also, 28 U.S.C. § 636(b)(1)(A).

that there is no issue of burden upon the plaintiffs in responding to the downstream discovery

requests and that the plaintiffs are only objecting on the basis of relevance.[11]

The scope of discovery is governed by Rule 26(b)(1) of the Federal Rules of Civil

Procedure which provides:

> "Parties may obtain discovery regarding any matter, not privileged,
> that is relevant to the claim or defense of any party, including the
> existence, description, nature, custody, condition, and location of
> any books, documents, or other tangible things and the identity and
> location of persons having knowledge of any discoverable matter.
> For good cause, the court may order discovery of any matter
> relevant to the subject matter involved in the action. Relevant
> information need not be admissible at the trial if the discovery
> appears reasonably calculated to lead to the discovery of
> admissible evidence. All discovery is subject to the limitations
> imposed by Rule 26(b)(2)(i), (ii), and (iii)."

Pursuant to Rule 26(b)(2)(iii) discovery shall be limited if the court determines that:

> "the burden or expense of the proposed discovery outweighs its
> likely benefit, taking into account the needs of the case, the amount
> in controversy, the parties' resources, the importance of the issues
> at stake in the litigation, and the importance of the proposed
> discovery in resolving the issues."

The overarching issue arising from the Defendants' Appeal is whether downstream

discovery is relevant to determine whether a class can be certified under Rule 23. Rule 23(a)(4)

provides that a suit may proceed as a class action only if "the representative parties will fairly

and adequately protect the interests of the class." Moreover, provided the three additional

prerequisites contained in Rule 23(a) are satisfied, one or more class members may sue on behalf

of a class only if, inter alia, "the court finds that questions of law or fact common to the members

of the class predominate over any questions affecting only individual members, and that a class

---

[11] In the written submissions and at the oral argument, each of the relevant plaintiffs groups dispute the
Defendants' position that the downstream discovery requests are not burdensome.

action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

The Defendants rely heavily upon the Eleventh Circuit's decision in Valley Drug Co. v. Geneva Pharma., Inc., 350 F.3d 1181 (11th Cir. 2003) for their arguments that downstream discovery is necessary to ensure that there are no conflicts within the putative class. The Defendants argue that because there are potential conflicts among members of the putative class, they are entitled to conduct downstream discovery to evaluate those conflicts so that they may mount a vigorous challenge to the certification of the class.

In Valley Drug, the Eleventh Circuit did not dispute that a defendant manufacturer cannot assert a pass-on defense against a direct purchaser who is pursuing an antitrust injury case. Id. at 1192. The Court also agreed that a direct purchaser may sue for and recover the full amount of the illegal overcharge regardless of whether he actually profited from the defendants' conduct. Id. However, in Valley Drug the Eleventh Circuit noted that the issue of what damages the plaintiff may recover is "a distinctly separate question from the issue of whether class certification is appropriate where a fundamental conflict exists among the named and unnamed members of a class." Id. The Court went on to explain that because some of the evidence in the record suggested that "the interests of the named representatives are not substantially aligned with the interests of all of the class members whom they purport to represent because some of the class members would have experienced a net gain from the conduct alleged to be wrongful," it was error for the district court to certify the class. Id. at 1193. The Court justified its decision by stating that "neither Hanover Shoe or its progeny imbue the named representative in this case with the automatic right to certify a class where the economic reality of the situation reveals that

a fundamental conflict may exist among the class members because of their different economic circumstances and different economic interests." Id.

In Valley Drug, the Eleventh Circuit narrowly interpreted Hanover Shoe as merely directing the district court to "overlook the potential net gain, or conversely the potential absence of a net loss, that a direct purchaser may in fact have experienced for the purposes of providing the direct purchaser with standing to sue and a means for calculating damages in antitrust violation litigation." Id. I respectfully disagree and decline to read Hanover Shoe as narrowly as the Eleventh Circuit.

As the Supreme Court made clear in Illinois Brick, the first reason that the so-called "pass-on" defense was barred in Hanover Shoe was because attempts to trace the downstream effects of overcharges would have unduly complicated already complex antitrust litigation:

> "The first reason for the Court's rejection of the offer of proof was an unwillingness to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variable would have behaved differently without the overcharge."

Illinois Brick, 431 U.S. at 725.

Based upon the Supreme Court's decisions in Hanover Shoe and Illinois Brick, if the Directs incurred an overcharge based upon the Defendants' alleged actions, they would be deemed to have suffered an antitrust injury and would be entitled to recover the full amount of the overcharge, regardless of whether they may have benefited in other ways from the Defendants' alleged actions. Whether different members of the putative class suffered a greater or lesser injury than the overcharge based upon differences in their economic status is immaterial because, for purposes of class certification, each member of the class is limited to the recovery of the full amount of the overcharge. All other measures of damages are irrelevant and attempts to

21

impose substantial discovery obligations upon members of the putative class to evaluate any other measure of damages is unwarranted.

As the Third Circuit has recognized, thwarted generic entry and competition results in an overcharge to purchasers and that overcharge is measured by the difference in price between the branded and the generic drug. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004). In Warfarin, the Third Circuit determined that the certification of a class that included third party payors, fixed co-pay consumers and out-of-pocket consumers was proper, despite objections from the defendants, because all of the class members "suffered direct economic harm when, as a result of [the defendant's] alleged misrepresentations, they paid supracompetitive prices for Coumadin instead of purchasing lower-priced generic warfarin sodium." Id. at 531.

Because all members of the putative class in this case will be entitled to the same measure of damages if successful – the amount of the overcharge – there can be no conflict within the putative class on the issue of damages. Acordingly, downstream discovery is irrelevant as a matter of law. The conclusion I reach here is supported in decisions by other courts within the Third Circuit.

For example, in Louisiana Wholesale Drug Co., v. Becton Dickinson, No. 05-CV-1602 (RJH), (D.N.J. October 17, 2005), Magistrate Judge Hedges issued a Letter Opinion and Order denying downstream discovery. In doing so, Magistrate Judge Hedges specifically rejected the defendants' reliance on Valley Drug and held that Valley Drug is contrary to the law in the Third Circuit.[12]

Becton held that the narrow reading of Hanover Shoe adopted by the Eleventh Circuit in Valley Drug was not the law of the Third Circuit and that expensive and burdensome

22

downstream discovery was not necessary because the members of the putative class can determine, based upon their business judgment, if their interests are adequately represented by the class. Id. at 5. Magistrate Judge Hedges held that it would be overly burdensome and expensive to require absent class members to respond to downstream discovery requests, particularly given that any class member that perceives a conflict will be permitted to opt-out of the class if it so chooses. Id.

I also reject the Defendants' argument that this case is materially different from the facts and circumstances in Becton. I agree with LWD that the fundamental antitrust claim in Becton and in this case is the same. In Becton and this case, the manufacturer allegedly shielded its product from competition by unlawfully delaying the market entry of competing products. In addition, the Defendants' contention that downstream discovery is necessary to examine the economic differences between K-Dur and its generics, again, is just an artfully stated, but thinly disguised pass-on argument.

In In re Tricor Direct Purchaser Antitrust Litigation, No. 05-340 (D. Del. March 6, 2006), Judge Jordan denied the defendants' request for downstream discovery because the compensable antitrust injury occurred when the purchaser paid the overcharge. Because the injury was complete at the time of the overcharge, Judge Jordan concluded that no downstream discovery was appropriate. In Tricor, Judge Jordan was presented with the same "conflicts" argument the Defendants make here based upon the Eleventh Circuit's decision in Valley Drug. In the Tricor case, just as in this case, the plaintiffs argued that downstream discovery was improper because: (a) under Hanover Shoe, discovery regarding a direct purchaser's own sales, prices and profits are irrelevant because direct purchasers are entitled to recover the full amount of an overcharge

---

[12] Magistrate Judge Hedges' Letter Opinion was affirmed in an unpublished Opinion and Order by District Judge Jose L. Linares on September 7, 2006. Louisiana Wholesale Drug Co., v. Becton Dickinson, No. 05-CV-1602

23

only; (b) that overcharge claims are complete upon the initial purchase, therefore precluding downstream discovery as a matter of law which, by necessity, precluded a "conflict" within a class of direct purchasers; (c) that the three largest wholesalers submitted statements stating that no conflict existed and voicing their support for the class action; and (d) all class members would be provided the opportunity to opt-out of the class if the class did not satisfy their financial needs.

Finding these arguments persuasive, in Tricor, Judge Jordan precluded the defendants from seeking downstream discovery as legally irrelevant because such discovery could not lead to finding of a conflict within the class sufficient to preclude class certification. Tr. of March 3, 2006 Telephone Conference at 34. What the direct purchaser did with the product after the purchase was irrelevant for purposes of defining the antitrust injury. Id. Although he did not issue a written opinion regarding his decision, the transcript of his oral decision from the bench indicates that he also considered the request for downstream discovery in the context of an alleged class conflict as the Defendants' argue here. However, he too determined that such a request was irrelevant.[13]

The Defendants also seek downstream discovery from the Directs so that they may determine whether questions of individualized injury and damages permeate the claims of the Indirects. I also reject this argument. Again, the Defendants seek downstream discovery so that they may track sales at every level of the distribution chain. Because of the decisions of the Supreme Court in Hanover Shoe and Illinois Brick – which preclude attempts to both prosecute and defend antitrust cases on the basis of the effects of pass-on damages – the Defendants here

---

(JLL), (D.N.J. Sept. 7, 2006).

[13] See also In re Automotive Refinishing Paint Antitrust Litigation, 2006 WL 1479819 at *8 (E.D. Pa. May 26, 2006) (rejecting the defendants' request for downstream discovery as irrelevant and declining to "depart from the long-held practice of proscribing discovery of downstream data and financial information."

24

have a very high standard to meet to establish the right to seek downstream discovery.

Magistrate Judge Haneke was correct in his decision that the Defendants have not met that high

standard. The Defendants are seeking downstream discovery from the Directs regarding claims

of the Indirects that I have already decided is not relevant for the reasons discussed above. It

also appears that the information the Defendants seek is available from IMS Health on a market-

wide basis. Further, although the Defendants cite thirteen cases in which the certification of a

class of indirect purchasers was denied, it appears that class certification was defeated by the

defendants in these cases without the need for downstream discovery. Therefore, it is apparent

that if the Defendants' wish to challenge class certification of the putative indirect class in this

case, they may do so without the benefit of burdensome downstream discovery.

I also reject the Defendants' arguments that downstream discovery is necessary to

determine the economic differences between branded and generic K-Dur. This argument is

merely another "back-door" attempt to seek the same information that is otherwise precluded by

Hanover Shoe and Illinois Brick. The only economic differences between branded and generic

K-Dur that are relevant to this case are the prices charged for the initial purchase of the products.

Pursuant to Hanover Shoe, if an antitrust injury is proven, the plaintiffs are entitled to the amount

of the overcharge that is calculated as the difference between the costs of the generic and the cost

of branded K-Dur. As discussed supra, there is no need to proceed with the burden of

downstream discovery to establish the alleged "economic differences" between the products.

The difference in price is all that is relevant.

Finally, I reject the Defendants' argument that downstream discovery is necessary to

determine whether the contracts between the wholesalers and the Direct Purchasers fall within

the purported "cost-plus" exception alluded to in Hanover Shoe, 392 U.S. at 494. Although the

25

Defendants raised the argument in their initial briefing, they have not continued to assert the "cost-plus" exception as a basis for ordering downstream discovery in subsequent filings. Nevertheless, I conclude that the narrow exception for cost-plus contracts identified in Hanover Shoe and Illinois Brick is not a basis for allowing downstream discovery in this case. This conclusion is supported by the fact that the Third Circuit has questioned whether the exception still exists. See, McCarthy v. Recordex Service, Inc., 80 F.3d 842, 855 (3d Cir. 1996) ("The vitality of the 'pre-existing cost-plus contract' exception is doubtful, however, in light of [Kansas v. Utilicorp United, Inc., 497 U.S. 199 (1990)]...[which] expressly refused to recognize an exception to Illinois Brick even when one hundred percent of the cost increases had been passed through to indirect purchasers").

Therefore, for all of the above reasons, I find that Magistrate Judge Haneke's decision denying the Defendants' request for downstream discovery was not clearly erroneous, or contrary to the law of the Third Circuit. The Defendants' reliance on Valley Drug is misplaced because the rationale of that decision has never been adopted by the Third Circuit, and has been rejected by courts within the Third Circuit. Given the state of the law in the Third Circuit, Magistrate Judge Haneke's Order denying downstream discovery cannot be deemed "clearly erroneous or contrary to law."

## C.     The Defendants' Appeal of the Denial of Discovery Regarding Market Definition

The Defendants seek discovery relating to the "relevant product market" claiming that it is necessary to define the relevant product market to analyze the various plaintiffs' antitrust claims. The Defendants contend that it is improper for the plaintiffs to limit their document production to documents concerning only K-Dur and its AB-rated generic equivalents. The Defendants argue that because the plaintiffs have alleged, in the alternative, a broader market definition including all potassium chloride supplements approved by the Food and Drug

26

Administration ("FDA"), they should be entitled to seek discovery regarding all potassium chloride supplements. They contend that they will need this discovery in the event the plaintiffs proceed on this alternative market definition. The Defendants also urge that I reject LWD's argument, that as a small regional wholesaler, the limited discovery available from it would not allow a thorough analysis of the more broadly defined relevant product market in any event.

LWD responds by arguing that the anti-competitive harm alleged in its complaint consists of the delay in the predictable and substantial price decline in K-Dur that was precipitated by the entry into the market of an AB-rated generic version of that drug. LWD contends that it intends to prove that the Defendants' agreement violated Section 1 of the Sherman Act and caused a delay in generic competition. LWD also argues that given the direct evidence of the alleged anti-competitive effect of the Defendants' actions, it is not required to prove a relevant product market through indirect methods. Finally, LWD submits that to the extent the Defendants need data to define the relevant market, that data is available from IMS Health.[14]

I conclude that Magistrate Judge Haneke's decision denying further discovery regarding the definition of the relevant market was neither clearly erroneous, nor contrary to law. It is clear in this case that the plaintiffs are alleging that the Defendants' illegally conspired to deny the entry of an AB-rated generic into the market that would have competed with branded K-Dur. Although the plaintiffs' complaints contain alternative theories of market definition, at this time, they are not advancing those alternative theories. Therefore, because the alternative theories of market definition do not appear to be relevant, there is no basis to reverse Magistrate Judge Haneke's ruling on this issue. However, the plaintiffs should be mindful that by refusing to

---

[14] I note that at least some of the Opt-Outs have produced some information regarding market definition beyond K-Dur and its AB-rated generics. However, the Defendants contend that not all of the Opt-Outs have done so.

27

produce discovery regarding a market definition broader than K-Dur and its AB-rated generics, they will be precluded from later offering such evidence to support a broader market definition.

## D.   The Defendants' Appeal of the Denial of Discovery Regarding the Named Consumer Plaintiffs' History of Switching from Branded to Generic Drugs Other Than K-Dur

The Defendants argue that to determine whether the named consumer plaintiffs would have switched from branded to generic K-Dur at the beginning of the alleged damages period (November 1998), they need to conduct discovery regarding their history of switching from branded to generic versions of other drugs. That Defendants contend that this information implicates questions of antitrust injury, damages and class certification. However, the Defendants admit that they have received information regarding the "switching behavior" from branded to generic K-Dur from at least six of the ten named consumer plaintiffs. Regardless, the Defendants contend that they are entitled to discovery of each of the named consumer plaintiffs' switching behavior for all drugs.

Although there is no discussion on the record by Magistrate Judge Haneke specifically addressing the reasons for his decision to preclude the requested discovery, the argument by the named consumer plaintiffs that the production of information regarding their medical treatment that is not related to K-Dur or its generic would implicate concerns of privacy is understandable. Other than their history of switching from branded to generic K-Dur (which is directly at issue in this case), the named consumer plaintiffs' privacy concerns outweigh the Defendants' need for this information. Therefore, I cannot conclude that Magistrate Judge Haneke's decision to deny this discovery was either clearly erroneous or contrary to law. Therefore, I will not reverse Magistrate Judge Haneke's decision on this issue.[15]

---

[15] However, to the extent that any named consumer plaintiff has not yet produced discovery regarding his or her history of switching from branded to generic K-Dur, that information shall be produced within thirty (30) days of the date of this Report and Recommendation.

28

**E.     The Direct's Cross-Appeal Concerning the Denial of Discovery Regarding Expenditures Made By Schering into Research and Development of K-Dur 20 and Other Drugs**

The Directs appeal that portion of Magistrate Judge Haneke's Order denying them discovery into the expenditures made by Schering for its research and development of K-Dur and other drugs. The Directs contend that they are entitled to this discovery based upon Schering's intent to rely on these costs as a defense. The Directs anticipate that Schering will attempt to assert as a defense that a finding of liability against Schering will affect the incentive to invest money for research and development. In order to respond to this anticipated defense, the Directs wish to obtain discovery regarding Schering's actual costs for research and development.

Schering responds by pointing out that its public filings made with the SEC contain information regarding its research and development costs and that the publicly filed information should be sufficient for the Directs' purposes. The Directs respond by stating that they do not have confidence that the costs reflected in Schering's public filings accurately depict the true costs of research and development and that those numbers may be inflated due to the inclusion of costs not related to research and development.

Again, although Magistrate Judge Haneke's ruling does not clearly state the reasons for his decision to deny the Directs' request for information regarding Schering's research and development costs, it is reasonable to assume that his decision was based, as Schering argues, on a balancing of the burden to Schering to produce the requested information and the possible benefit to the Directs. Because the information sought by the Directs is available in some form in the public filings made by Schering, I cannot conclude that Magistrate Judge Haneke's decision was clearly erroneous or contrary to law. Therefore, I shall affirm Magistrate Judge Haneke's decision on this issue.

29

F.     **The Direct's Cross-Appeal Concerning the Denial of Discovery Regarding Expert Reports Previously Produced by the Defendants to the FTC**

The Directs seek the production of expert reports submitted by the Defendants to the FTC in the prior FTC proceeding.  Although the Directs acknowledge that Magistrate Judge Haneke previously refused to order the production of the expert reports as premature, they now seek their production.

The Defendants argue that the Court has already addressed the issue of the production of these reports and ruled that once the Defendants' experts are designated in this case, the Court would consider the Directs' requests to obtain the reports at that time.  Because the parties have not yet identified and designated their experts at this time, I see no reason to reverse Magistrate Judge Haneke's prior ruling on this issue at this time.

Therefore, the Direct's Cross-Appeal seeking the production of expert reports previously produced to the FTC is denied.

### III.    CONCLUSION

For the foregoing reasons, I conclude that both the Appeal and the Cross-Appeal shall be denied and Magistrate Judge Haneke's March 24, 2005 Order shall be affirmed.  There is nothing in the record before me to indicate that the denial of discovery contained in Magistrate Judge Haneke's March 24, 2005 Order was clearly erroneous or contrary to law.  I agree with Magistrate Judge Haneke that the downstream discovery sought by the Defendants is not relevant.  I also agree with Magistrate Judge Haneke that the Defendants do not need discovery regarding market definition given the legal theories being advanced by the various plaintiffs. Finally, I conclude that Magistrate Judge Haneke's decision denying the Defendants access to the consumer plaintiffs' medical records beyond their purchases of branded K-Dur and its generic equivalents also was correct.

30

As for the Cross-Appeal, I again conclude that Magistrate Judge Haneke's decision was not clearly erroneous, or contrary to law. The Directs can determine Schering's research and development costs based upon information contained in Schering's publicly filed documents. I also see no reason to modify Magistrate Judge Haneke's previous decision that the issue of the production of expert reports produced by the Defendants to the FTC will be addressed at the time experts are identified in this case.

**As provided in the Order entered by Magistrate Judge Arleo in this matter, the Special Master's decision on any motion can be appealed to Judge Greenaway in the manner, and subject to the standards of review set forth in Rule 53 of the Federal Rules of Civil Procedure and applicable Local Rules.**

ENTERED this
2nd day of January, 2007

STEPHEN M. ORLOFSKY
SPECIAL MASTER

31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| IN RE K-DUR ANTITRUST LITIGATION | ) | |
| | ) | Civil Action No. 01-1652 (JAG) |
| | ) | (Consolidated Cases) |
| This Document Relates To: | ) | |
| | ) | |
| All Actions | ) | MDL Docket No. 1419 |
| | ) | |

**ORDER**

The Special Master having considered Defendants, Schering-Plough Corporation's

("Schering") and Upsher-Smith Laboratories, Inc.'s ("Upsher") April 1, 2005 Appeal from the

March 24, 2005 Discovery Order entered by Magistrate Judge G. Donald Haneke and all of the

filings of the parties as identified in my Report and Recommendation, as well as the oral

argument of counsel on October 16, 2006, for the reasons set forth in the Report and

Recommendation filed with this Order, **IT IS HEREBY ORDERED**, this 2nd day of January,

2007, that the Appeal is **DENIED,** and **IT IS FURTHER ORDERED** that Magistrate Judge G.

Donald Haneke's Order of March 24, 2005 is **AFFIRMED**; and,

The Special Master, having considered the Direct Purchaser Plaintiffs' April 21, 2005

Cross-Appeal of the March 24, 2005 Discovery Order entered by Magistrate Judge G. Donald

Haneke, and the briefs filed by the parties in support of and in opposition to the Cross-Appeal, as

well as the oral argument of counsel on October 16, 2006, for the reasons set forth in the Report

and Recommendation filed with this Order, **IT IS HEREBY ORDERED**, this 2nd day of

January, 2007, that the Cross-Appeal is **DENIED**; and, **IT IS FURTHER ORDERED** that

Magistrate Judge G. Donald Haneke's Order of March 24, 2005 is **AFFIRMED**.

ENTERED this
2nd day of January, 2007

STEPHEN M. ORLOFSKY
SPECIAL MASTER

2