

Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA 94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email: nnorris@winston.com

James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:    312-558-5600
Facsimile:    312-558-5700
Email: jhurst@winston.com; ddoyle@winston.com;
spark@winston.com

Charles B. Klein (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20007
Telephone:    202-282-5000
Facsimile:    202-282-5100
Email: cklein@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| MEIJER, INC. & MEIJER DISTRIBUTION, INC., on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   vs.<br><br>ABBOTT LABORATORIES,<br><br>        Defendant.<br><br>   [caption continues next page] | **Case No. C 07-5985 CW**<br><br>*Related by Order to:*<br><br>*Case No. C 04-1511 CW*<br><br>**SUPPLEMENTAL DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES' REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES** |

**Winston & Strawn LLP**
**35 W. Wacker Drive**
**Chicago, IL 60601-9703**

| | |
|---|---|
| 1 | ROCHESTER DRUG CO-OPERATIVE, INC., ) on behalf of itself and all others similarly ) situated, ) | The Honorable Judge Wilken **Case No. C 07-6010 CW** |
| 2 | | |
| 3 | Plaintiffs, ) | *Related by Order to:* |
| 4 | vs. ) | *Case No. C 04-1511 CW* |
| 5 | ABBOTT LABORATORIES, ) | |
| 6 | Defendant. ) | The Honorable Judge Wilken |

1   ROCHESTER DRUG CO-OPERATIVE, INC., )   The Honorable Judge Wilken
    on behalf of itself and all others similarly )   **Case No. C 07-6010 CW**
2   situated,                                   )
                                                )   *Related by Order to:*
3                   Plaintiffs,                 )
                                                )   *Case No. C 04-1511 CW*
4        vs.                                    )
                                                )
5   ABBOTT LABORATORIES,                        )
                                                )
6                   Defendant.                  )   The Honorable Judge Wilken
                                                )
7                                               )
                                                )
8                                               )
                                                )
9                                               )
                                                )
10  LOUISIANA WHOLESALE DRUG                    )
    COMPANY, INC., on behalf of itself and all  )   **Case No. C 07-6118 CW**
11  others similarly situated,                  )
                                                )   *Related by Order to:*
12                  Plaintiffs,                 )
                                                )   *Case No. C 04-1511 CW*
13       vs.                                    )
                                                )
14  ABBOTT LABORATORIES,                        )
                                                )
15                  Defendant.                  )   The Honorable Judge Wilken
                                                )

16
17
18
19
20
21
22
23
24
25
26
27
28

CASE NOS. C 07-5985, C 07-6010, C 07-6118 — Supplemental Declaration of Joel Hay, Ph.D. in
Support of Abbott Laboratories' Reply in Support of Its Motion to Compel
Production of Documents And Interrogatory Responses

1

2

**TABLE OF CONTENTS**

3

I.    INTRODUCTION ..................................................................................................2

II.    PURPORTED CLASS MEMBERS WOULD HAVE ANTAGONISTIC ECONOMIC
      INTERESTS WITH RESPECT TO PLAINTIFFS' FUNDAMENTAL THEORY OF LIABILITY. ...........3

      A.    Direct purchasers that benefit from higher drug prices would have conflicting
            economic interests with those that do not. ......................................................3

      B.    Direct purchasers that primarily buy Norvir would have conflicting economic
            interests with those that primarily buy Kaletra. ............................................9

II.    DISCOVERY ON DOWNSTREAM SALES WOULD AID IN ASSESSING THE
      ANTAGONISTIC ECONOMIC INTERESTS AMONG PURPORTED CLASS MEMBERS. ................11

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Winston & Strawn LLP**
**35 W. Wacker Drive**
**Chicago, IL 60601-9703**

I.    **INTRODUCTION**

1.    I previously filed a declaration in which I described the potential conflict of interest among members of class proposed by plaintiffs and why limited discovery on the "downstream" sales of a small number of purported class members would be needed to determine more precisely the nature and extent of that conflict.[1]   Plaintiffs argue that conflicts of interest among members of the proposed class do not exist because "class members share a common interest in maximizing overcharge damages" and because plaintiffs do not seek injunctive relief or lost profits.[2]   However, plaintiffs misconstrue the nature of the conflict among purported class members.  In particular, the conflict among purported class members does not depend on the specific remedy that plaintiffs seek, including whether or not plaintiffs seek injunctive relief or lost profits.  Nor do the conflicting interests among the purported class members relate solely to the estimation of alleged overcharges.

2.    The purpose of this supplemental declaration is to describe in more detail the potential conflict among putative class members.  As discussed in paragraphs 25-27 of my original declaration and described in more depth below, even assuming that all purported class members have an interest in "maximizing overcharge damages," these members nevertheless have antagonistic economic interests with regard to the theory of liability in this case.  This is because plaintiffs' theory of liability may determine Abbott's future pricing for Norvir and Kaletra if liability were found, even if plaintiffs do not seek injunctive relief.  Accordingly, different direct purchasers would prefer different, and conflicting, theories of liability depending in part on whether they profit from higher prices of Norvir and Kaletra.  Thus, contrary to plaintiffs' claim that the conflict among purported class members "does not relate to the underlying merits of the suit," the antagonistic economic interests among class members pertain to plaintiffs' fundamental theory of liability in this case.[3]

---

[1] Declaration of Joel Hay, Ph.D. in Support of Abbott Laboratories' Motion to Compel Production of Documents and Interrogatory Responses ("Hay Declaration").

[2] Opposition of Plaintiffs Meijer, Inc., Meijer Distribution, Inc., Rochester Drug Cooperative, Inc., and Louisiana Wholesale Drug Company, Inc. to Defendant Abbott Laboratories' Motion to Compel Production of Documents and Interrogatory Responses ("Plaintiffs' Opposition"), p. 17.

[3] *Id.*

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

CASE NOS. C 07-5985, C 07-6010, C 07-6118 — SUPPLEMENTAL DECLARATION OF JOEL HAY, PH.D. IN
SUPPORT OF ABBOTT LABORATORIES' REPLY IN SUPPORT OF ITS MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES

## II.    PURPORTED CLASS MEMBERS WOULD HAVE ANTAGONISTIC ECONOMIC INTERESTS WITH RESPECT TO PLAINTIFFS' FUNDAMENTAL THEORY OF LIABILITY.

3.    The primary conduct challenged by plaintiffs is Abbott's increase in the price of Norvir without an increase in the price of Kaletra.[4]   However, plaintiffs have offered several alternative theories of liability, involving very different legal and economic standards for assessing whether a particular pricing structure constitutes legitimate business conduct or anticompetitive conduct.  In fact, plaintiffs' economic expert, Dr. Hal Singer, suggests at least three different frameworks for assessing liability in this case.[5]

4.    If Abbott were found liable, plaintiffs' theory of liability could determine Abbott's conduct going forward, even if plaintiffs do not seek injunctive relief.  For example, if the Court were to conclude that any increase in the price of Norvir above pre-December 2003 levels is anticompetitive, such a conclusion could effectively force Abbott to roll-back the price of Norvir to avoid continuing damages.  Accordingly, the theory of liability pursued by plaintiffs, if successful, would likely affect Abbott's future pricing of Norvir and/or Kaletra.[6]   However, members of the class proposed by plaintiffs would have antagonistic interests with respect to the alternative theories of liability that plaintiffs propose.  As I describe below, direct purchasers that benefit from higher drug prices would have divergent economic interests from those that do not in terms of which theory of liability to pursue (Section II.A).  These economic interests further diverge given that some direct purchasers primarily purchased Norvir whereas others primarily purchased Kaletra (Section II.B).

    A.    *Direct purchasers that benefit from higher drug prices would have conflicting economic interests with those that do not.*

5.    Plaintiffs allege that Abbott anticompetitively raised the price of Norvir without also raising the price of Kaletra.  Dr. Singer has suggested three alternative, and conflicting, standards for

---

[4] *Meijer, Inc. et al on behalf of Themselves and All Other Persons Similarly Situated, v. Abbott Laboratories*, Consolidated Amended Complaint, ("Complaint"), p. 10.

[5] Class Certification Declaration of Hal Singer, Ph.D. ("Singer Declaration"), p. 13.

[6] I am in no way suggesting that any form of injunctive relief would be a proper remedy if plaintiffs were to prove that Abbott violated the antitrust laws.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1   assessing whether this pricing structure is anticompetitive or is permissible pricing under the

2   antitrust laws.[7]  First, Dr. Singer proposes a "consumer-welfare standard" under which any increase

3   in the price of Norvir is anticompetitive.[8]  Specifically, Dr. Singer suggests that "violation depends

4   on proof that a penalty price for [Norvir] was set above the 'Independent Monopoly Price.'"[9]

5   According to Dr. Singer, the "penalty price of Norvir" is equal to the price of Norvir after the price

6   increase ($17.14 for 200mg) and the "independent monopoly price" is equal to the Norvir price

7   before the price increase ($3.42 for 200mg).[10]  Accordingly, the "consumer-welfare" liability

8   standard proposed by Dr. Singer would find Abbott liable if there was any increase in the price of

9   Norvir above pre-December 2003 levels.  Dr. Singer also proposes estimating overcharges on the

10   sale of Norvir under the same "consumer-welfare standard," which assumes that any increase in the

11   price of Norvir is anticompetitive and amounts to overcharges.[11]

12       6.       Second, Dr. Singer proposes a "raising-rivals'-costs" model.[12]  The raising-rivals'-cost

13   framework for assessing anticompetitive pricing behavior seems to suggest that any increase in the

14   price of Norvir without a commensurate increase in the price of Kaletra is anticompetitive.

15   According to Dr. Singer, this is because any increase in the price of Norvir without a proportionate

16

17   [7] I summarize the liability standards proposed by Dr. Singer in order to demonstrate plaintiffs'
    antagonistic economic interests with respect to these liability theories.  For the purposes of this

18   declaration, I assume that plaintiffs' allegations are true and that Dr. Singer's three liability theories
    could form the basis for liability in this case.  However, I do not accept, expressly or implicitly, that

19   the liability standards proposed by Dr. Singer apply to Abbott's pricing.  Nor do I accept Dr.
    Singer's application of these standards.

20   [8] Singer Declaration, pp. 13-14.

21   [9] Id. at 14.

22   [10] Id. at 16.  Throughout his report, Dr. Singer assumes that Norvir is taken as a booster in a 200mg
    daily dose.  This assumption is incorrect.  Abbott's primary competitors for Kaletra (Reyataz and

23   Lexiva) are boosted with only a 100 mg dose of Norvir.  Dr. Singer's error materially affects the
    conclusions and calculations in his report.  Nevertheless, this error has no effect on whether a

24   potential conflict exists among purported class members.  Thus, for simplicity, I am accepting as
    true—solely for purposes of Abbott's pending motion to compel—Dr. Singer's calculations in his

25   report concerning Norvir.  Nothing in this supplemental declaration should be construed as an
    express or implied agreement with any aspect of Dr. Singer's analysis.

26   [11] For instance, Dr. Singer states that "the overcharge under the consumer-welfare standard is based
    directly on the 400 percent Norvir WAC price increase."  Id. at 29-30.

27   [12] Id. at pp. 36-37.

28

CASE NOS. C 07-5985, C 07-6010, C 07-6118 — SUPPLEMENTAL DECLARATION OF JOEL HAY, PH.D. IN
SUPPORT OF ABBOTT LABORATORIES' REPLY IN SUPPORT OF ITS MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    increase in the price of Kaletra raises the cost of an alternative boosted PI regimen relative to the

2    price of Kaletra.[13]

3        7.    Third, Dr. Singer claims that Abbott's pricing structure may be anticompetitive under a

4    *Cascade* liability standard.[14]   Under the *Cascade* standard, a necessary (but not sufficient) condition

5    for an anticompetitive pricing structure is that the "attributed" price of lopinavir is less than some

6    relevant measure of cost for lopinavir.[15]   Dr. Singer also proposes estimating overcharges under the

7    *Cascade* standard, comparing the actual prices paid to prices they would have paid in "a but-for

8    world in which Abbott imposes a price increase on Norvir, but only up to the level that would be

9    allowed under the *Cascade* standard."[16]

10       8.    These different theories of liability would likely have very different implications for

11   Abbott's future pricing of Norvir and Kaletra if Abbott were found liable.  Under the first theory of

12   liability—*i.e.*, if the Court found that any increase in the price of Norvir is anticompetitive—

13   plaintiffs essentially suggest that Abbott should be forced to roll-back the price of Norvir, perhaps to

14   pre-December 2003 levels ($3.42 for a 200mg dose or $1.71 for a 100mg dose), regardless of the

15   price of Kaletra.[17]

16       9.    On the other hand, if Abbott were found liable under the second theory of liability—*i.e.*,

17   if the Court found that increases in the price of Norvir without commensurate increases in the price

18   of Kaletra were anticompetitive—Abbott would be able to maintain a price of Norvir higher than

19   pre-December 2003 levels if it also increased the price of Kaletra proportionately.  In fact, under

20   plaintiffs' second theory, the price of Norvir could remain at current levels ($17.14 for a 200mg

21   _____

22   [13] *Id.*

     [14] *Id.* at 14-16.

23   [15] *Cascade Health Solutions (f/k/a McKenzie Williamette Hospital) v. PeaceHealth*, 515 F.3d 883
     (9th Cir. 2008).  The court stated that "[t]o prove that a bundled discount was exclusionary or

24   predatory for the purposes of monopolization or attempted monopolization claim under § 2 of the
     Sherman Act, the plaintiff must establish that, after allocating the discount given by the defendant on

25   the entire bundle of products to the competitive product or products, the defendant sold the
     competitive product or products below its average variable cost of producing them."  *Id.* at 910.

26   [16] Singer Declaration, p. 5.

27   [17] *Id.* at 23.

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1   dose) if Abbott raised the price of Kaletra to $32.50.[18]  This theory of liability, if successful, likely

2   would result in prices for Norvir and Kaletra going forward that are higher than the first liability

3   theory because Abbott likely would find it profit-maximizing to set the price for Norvir higher than

4   the pre-December 2003 level.

5       10.     Similarly, the *Cascade* safe harbor standard would result in a Norvir price that is higher

6   than the pre-December 2003 price regardless of the measure used to determine the relevant cost of

7   lopinavir.  Dr. Singer calculates that the price of Norvir under the *Cascade* safe harbor standard

8   could be as high as $14.16 (for a 200 mg dose) if Abbott did not increase the price of Kaletra.[19]   If

9   Abbott did raise the price of Kaletra, the price of Norvir could be higher than this.  Abbott's future

10  price for Norvir also likely would be higher under the *Cascade* standard than under the second

11  liability theory.  This is because the second liability theory may establish a minimum difference

12  between the price of Kaletra and the price of Norvir that is much larger than under the *Cascade*

13  standard.  The second theory would restrict the difference between the price of Kaletra ($18.78 pre-

14  December 2003) and the price of Norvir ($3.42 for a 200 mg dose pre-December 2003) to equal or

15  greater than pre-December 2003 levels ($18.78 - $3.42 = $15.36).[20]   The *Cascade* standard, on the

16  other hand, would restrict the differential between the prices of Kaletra and Norvir to some relevant

17  cost of lopinavir, however it is measured.  According to Dr. Singer, the minimum allowable

18  difference in the prices of Kaletra and Norvir under a *Cascade* standard is $4.62.[21]   Because the

19  second liability theory forces Abbott to increase the price of Kaletra above the profit-maximizing

20  level much more than the *Cascade* standard for a given increase in the price of Norvir, Abbott's

---

[18] Pre-December 2003, the difference between the price of Kaletra ($18.78) and a 200 mg dose of Norvir ($3.42) was $15.36.  For this difference to remain the same given a 200 mg Norvir price of $17.14, the price of Kaletra would need to increase to $32.50 ($17.14 + $15.36).

[19] *Id*. at 23.  Dr. Singer's calculation of the price of Norvir under a *Cascade* standard is flawed for several fundamental reasons that I do not address in this declaration.  Regardless, I refer to Dr. Singer's calculations for purposes of this declaration to highlight the significantly different implications of the alternative liability theories offered by Dr. Singer.

[20] *Id*. at 16.

[21] *Id*. at 23.

CASE NOS. C 07-5985, C 07-6010, C 07-6118 — SUPPLEMENTAL DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES' REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES

1    profit-maximizing price for Norvir under the second theory likely would be lower than under the

2    *Cascade* standard.

3        11.    The implication of the different theories of liability for Abbott's likely future pricing of

4    Norvir can be summarized as follows:  the post-judgment price of Norvir likely would be highest

5    under the third theory, followed by the second theory and then the first theory.

6        12.    The alternative theories of liability offered by plaintiffs also would have very different

7    implications for Abbott's future pricing of Kaletra.  If Abbott were found liable under the first

8    liability theory, Abbott's pricing for Kaletra would unlikely be higher than its current level.  Under

9    the second theory of liability, on the other hand, Abbott could comply with such a liability standard

10   by increasing the price of Kaletra, rather than decreasing the price of Norvir.  In fact, Abbott may

11   find it profit-maximizing to keep the price of Norvir at its current level and to raise the price of

12   Kaletra to $32.50.[22]  Alternatively, Abbott may find it profit-maximizing to lower the price of Norvir

13   somewhat but still set a price for Kaletra higher than its current level.  Regardless of the precise level

14   of profit-maximizing prices, liability under the second theory almost surely would imply higher

15   prices for Kaletra going forward than under the first theory.

16       13.    The second liability standard also likely would lead to higher prices of Kaletra compared

17   to the third liability theory, the *Cascade* standard.  As I discuss above, the minimum allowable

18   difference between the Kaletra and Norvir prices under the second liability theory would be greater

19   than the price difference under a *Cascade* standard, regardless of the measure used to determine the

20   relevant cost of lopinavir.  A greater difference between the prices of Kaletra and Norvir likely

21   would lead to a higher price of Kaletra going forward because, for any price of Norvir, it would yield

22   a higher minimum allowable price for Kaletra.  Under the *Cascade* standard, according to Dr.

23   Singer, Abbott would be allowed to increase the pre-December 2003 price of Norvir to $14.16 (for a

24   200 mg dose) without also raising the price of Kaletra.  In contrast, under the second liability theory,

25

26

27   [22] *Supra* note 18.

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1   any increase in the price of Norvir above pre-December 2003 levels must be accompanied by an

2   increase in the price of Kaletra.

3       14.     The implication of the different theories of liability for Abbott's future pricing for Kaletra

4   can be summarized as:  the post-judgment price of Kaletra likely would be highest under the second

5   theory of liability, followed by the third and then by the first.

6       15.     Different types of direct purchasers would be affected very differently by Abbott's post-

7   judgment pricing depending on the theory of liability asserted (assuming liability is determined).  As

8   I describe in my original declaration, some wholesalers use "cost-plus" pricing and profit from the

9   "float" on their sales of pharmaceutical products.[23]  These wholesalers receive a net economic

10  benefit from higher drug prices, including Norvir and Kaletra.[24]   In fact, plaintiffs do not dispute that

11  some direct purchasers profit from higher Norvir and Kaletra prices.

12      16.     Because plaintiffs' theory of liability may determine Abbott's pricing going forward if

13  Abbott were found liable, these wholesalers may have antagonistic interests to direct purchasers that

14  do not profit from higher drug prices in terms of which theory of liability to pursue.  In particular,

15  members of the purported class that do not profit from higher Norvir and Kaletra prices may prefer a

16  roll-back of the Norvir price increase to pre-December 2003 levels, and therefore may find it in their

17  interests to pursue the first theory of liability (*i.e.*, that any increase in the price of Norvir is

18  anticompetitive).  For instance, I understand that certain clinics, such as the Free Medical Clinic of

19  Cleveland, do not resell Norvir and Kaletra and therefore absorb the entire increase in the price of

20  these and other drugs.  These direct purchasers clearly would prefer a theory of liability that would

21  allow them to recover overcharge damages while, at the same time, having the effect of completely

22  rolling-back the prices of Norvir and Kaletra.

23      17.     On the other hand, members of the purported class that profit from higher Norvir and

24  Kaletra prices (because they pass-through greater than 100 percent of price increases) would prefer a

---

[23] Hay Declaration, pp. 6-9.

[24] The increases in the prices of Norvir and Kaletra are unlikely to have reduced the quantity of Norvir and Kaletra sold by most wholesalers because the demand for Norvir and Kaletra is very inelastic.  *See* Hay Declaration, pp. 9-11.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

CASE NOS. C 07-5985, C 07-6010, C 07-6118 — SUPPLEMENTAL DECLARATION OF JOEL HAY, PH.D. IN
SUPPORT OF ABBOTT LABORATORIES' REPLY IN SUPPORT OF ITS MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES

1    liability theory based on the premise that any Norvir price increase must be accompanied by

2    commensurate increases in the price of Kaletra. As I describe above, such a liability standard, if

3    accepted, would entitle these direct purchasers to recover overcharge damages *and* lead to higher

4    prices for Norvir and Kaletra (and thus more future profits for these direct purchasers) than a

5    standard which holds that any increase in the price of Norvir is anticompetitive.

6    18.    Direct purchasers that profit from higher drug prices also may prefer a liability theory

7    based on the *Cascade* standard rather than one that could essentially force Abbott to roll back the

8    price of Norvir to pre-December 2003 levels.  Liability under such a standard also would lead to

9    higher prices for Norvir and Kaletra going forward than if Abbott is forced to roll back its prices to

10   pre-December 2003 levels.

11   19.    Whether wholesalers that profit from higher drug prices prefer the second theory of

12   liability or the *Cascade* standard depends on their relative purchases of Norvir and Kaletra.  As

13   explained above, the *Cascade* standard likely would lead to higher Norvir prices but lower Kaletra

14   prices than the second theory of liability.  As I describe in the Section below, this creates another

15   potential conflict of interest among members of the purported class.

16         **B.    *Direct purchasers that primarily buy Norvir would have conflicting economic***

17              ***interests with those that primarily buy Kaletra.***

18   20.    The purported class of direct purchasers includes purchasers that bought only (or

19   primarily) Kaletra and purchasers that bought only (or primarily) Norvir.  According to the Abbott

20   sales data, at least 35 direct purchasers bought only Kaletra during the relevant period.[25]   On the

21   other hand, at least 48 direct purchasers bought only Norvir.[26]

22   21.    These different subgroups in the purported class also may have antagonistic interests

23   regarding which liability theory to pursue.  In particular, purchasers that buy only (or primarily)

24   Kaletra may have conflicting interests with purchasers that buy only (or primarily) Norvir because

25

26   [25] Source:  Abbott transaction sales data.  This statistic excludes opt-outs and direct purchasers that
     bought less than $1000 of Norvir and Kaletra during the relevant period (2004-2007).

27   [26] *Id.*

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

these subgroups of purchasers may be affected differently by Abbott's future pricing structure. Moreover, whether a particular direct purchaser benefits from Abbott's pricing also depends on whether the purchaser profits from higher drug prices. For ease of exposition, I divide the purported class members into four subgroups, as shown in Table 1 below. In reality, there may be many more than four subgroups of purported members with antagonistic interests because direct purchasers vary along a continuum in terms of their relative purchases of Norvir and Kaletra.

### Table 1: Preferred Liability Theories by Direct Purchaser Subgroup

|  | Purchasers of Kaletra | Purchasers of Norvir |
|---|---|---|
| **Pass-through > 100%** | Prefer high price of Kaletra<br><br>Preferred theory: 2nd<br>Second choice: 3rd | Prefer high price of Norvir<br><br>Preferred theory: 3rd<br>Second choice: 2nd |
| **Pass-through < 100%** | Prefer low price of Kaletra<br><br>Preferred theory: 1st<br>Second choice: 3rd | Prefer low price of Norvir<br><br>Preferred theory: 1st<br>Second choice: 2nd |

22.    Because plaintiffs' liability theory may affect Abbott's pricing going forward if Abbott were found liable, these subgroups may have conflicting interests as to the fundamental theory of liability to pursue. Direct purchasers that buy only (or primarily) Kaletra and pass-through 100 percent or more of drug price increases would prefer a liability theory which leads to higher Kaletra prices going forward. Such purchasers likely would prefer to pursue the second theory of liability (based on the premise that any increase in the price of Norvir without a commensurate increase in the price of Kaletra is anticompetitive), because such a theory likely would lead to higher prices of Kaletra going forward than the first and third theories of liability if Abbott were found liable.

23.    In contrast, direct purchasers that buy only (or primarily) Norvir and pass-through 100 percent or more of drug price increases would prefer a liability theory which leads to higher Norvir

1    prices going forward. Such purchasers likely would prefer to pursue the third liability theory (the

2    *Cascade* standard), because such a theory likely would lead to higher prices of Norvir going forward

3    than the other two theories.

4    24.    Direct purchasers that do not pass through more than 100 percent of drug price increases

5    to customers would have altogether different incentives that these two subgroups. Purchasers of

6    Kaletra and Norvir that do not profit from higher drug prices would prefer lower prices of Kaletra

7    and Norvir, respectively, going forward. Both of these subgroups likely would prefer the first

8    liability theory—that any increase in the price of Norvir is anticompetitive—which likely would

9    yield lower Kaletra and Norvir prices than the other theories. But those who purchase mostly

10   Kaletra would prefer the *Cascade* standard to the second liability theory, and those who purchase

11   mostly Norvir would prefer the second theory to the *Cascade* standard. Table 1 above summarizes

12   the economic interests of each of the four subgroups with respect to the alternative liability theories.

13   **II.    DISCOVERY ON DOWNSTREAM SALES WOULD AID IN ASSESSING THE**

14   **ANTAGONISTIC ECONOMIC INTERESTS AMONG PURPORTED CLASS MEMBERS.**

15   25.    As the above discussion makes clear, the conflict of interest among the purported class

16   members regarding plaintiffs' liability theories depends, in part, on whether a particular direct

17   purchaser profits from higher drug prices by passing-through more than 100 percent of drug price

18   increases to its customers. Thus, assessing more precisely the economic conflict between purported

19   class members described above would be aided by limited discovery on "downstream" sales of a

20   small number of purported class members. Specifically, the pass-through issue could be directly

21   analyzed using data on the sales prices received by some members of the proposed class.

22   Alternatively, financial documents showing gross profit margins on the sale of Norvir and Kaletra

23   also could be used to determine the effect of the Norvir and Kaletra price increases on the

24   profitability of purported class members.

25   26.    I understand that plaintiffs have argued that "the downstream discovery campaign Abbott

26   seeks to employ would involve complicated and expensive burdens on Plaintiffs."[27]   In particular,

27   ───────────────
[27] Plaintiffs' Opposition, p. 23.

28

CASE NOS. C 07-5985, C 07-6010, C 07-6118 — SUPPLEMENTAL DECLARATION OF JOEL HAY, PH.D. IN
SUPPORT OF ABBOTT LABORATORIES' REPLY IN SUPPORT OF ITS MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    plaintiffs claim that "collecting and producing the information would require sifting through tens (if

2    not hundreds) of thousands of transactions for hundreds of customers for the entire period from 2002

3    through 2006."[28]   However, the transaction sales data that would allow analysis of downstream

4    issues likely is kept by wholesalers in electronic datasets that are easily accessible.

5        27.    I have previously seen and analyzed "downstream" sales data from wholesalers in

6    connection with my work as an expert witness.  Based on my experience in the pharmaceutical

7    industry and in prior litigation, such discovery does not require "sifting through tens (if not

8    hundreds) of thousands of transactions."[29]  It is my understanding that most drug wholesalers are

9    sophisticated firms that maintain electronic databases of current and past transactions.  These

10   electronic transaction databases are searchable, and therefore do not require manually sorting

11   through the data in order to isolate particular transactions, such as sales of Norvir and Kaletra during

12   a particular time period.

13

14        I declare under penalty of perjury under the laws of the United States of America that the

15   foregoing is true and correct.

16

17

18   Dated: May 30, 2008                    By: _____

19                                              Joel Hay, Ph.D.

20

21

22

23

24

25

26   [28] *Id.*

27   [29] *Id.*

28

CASE NOS. C 07-5985, C 07-6010, C 07-6118 — SUPPLEMENTAL DECLARATION OF JOEL HAY, PH.D. IN
SUPPORT OF ABBOTT LABORATORIES' REPLY IN SUPPORT OF ITS MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES